United States Court of Appeals,

Eleventh Circuit.

No. 96-8689.

Terri L. STEWART, Plaintiff-Appellant,

v.

HAPPY HERMAN'S CHESHIRE BRIDGE, INC., Defendant-Appellee.

July 24, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-cv-512-GET), G. Ernest Tidwell, Judge.

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and LAY[*], Senior Circuit Judge.

HATCHETT, Chief Judge:

In this Americans With Disabilities Act (ADA) case we affirm the district court's grant of summary judgment to Happy Herman's Cheshire Bridge, Inc. (Happy Herman's), because Happy Herman's reasonably accommodated its former employee Teri Stewart, the appellant, and because Stewart failed to produce sufficient evidence of a triable issue on the question of whether Happy Herman's illegally retaliated against her. We also affirm the district court's award of sanctions and attorney's fees to Happy Herman's.

BACKGROUND

Happy Herman's, a small retail grocery store in Atlanta, has operated for twenty-two years and has approximately eighteen employees. In November 1991, Stewart applied for a part-time position at Happy Herman's. When General Manager David Levine interviewed Stewart, Stewart informed Levine that she had previously undergone pelvic surgery and could not stand for long periods of time or lift heavy objects. Stewart also indicated that if Happy Herman's hired her it would need to allow her to take frequent bathroom breaks. Stewart also inquired about the length of lunch breaks. According to Stewart, Levine replied that lunch breaks were "half an hour, but you will still have to get up and wait on customers." In addition, Levine reportedly told Stewart that she

[*]Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

could take bathroom breaks as needed.

Levine soon hired Stewart as a part-time seasonal employee, and subsequently retained her as a permanent part-time employee. Stewart worked primarily as a cashier, four days a week for six to seven hours a day. Although Levine initially hired Stewart as a seasonal employee, Happy Herman's permitted her to participate in its health insurance plan because Stewart informed Levine that health insurance was very important to her.

Although Stewart now claims to be disabled, at the time she filled out her health insurance plan application, she answered "no" to the question, "are you currently hospitalized or disabled." In fact, Stewart suffered from a number of conditions arising from the radical pelvic surgery she underwent to combat invasive cervical cancer. These conditions include an inability to fully employ her bladder and chronic pain for which Stewart takes prescription medications. According to Stewart, her conditions make it impossible for her to stand for long periods without sitting, limit her ability to lift objects and cause her to urinate frequently.

During the period from November 1991 through April 1993, Stewart seemed to do well at Happy Herman's. She had some physical problems, but Happy Herman's management consented to every request she made for accommodations. For instance, when Stewart complained that she was unable to restock the drink cooler, Happy Herman's reassigned that duty to another employee. When Stewart asked for help carrying large bags of groceries, Happy Herman's provided it. When Stewart told Happy Herman's that she could not work additional hours, Levine did not discipline her or take any other adverse employment action. And when Stewart requested bathroom and cigarette breaks, Happy Herman's granted her requests. (On average, Stewart took four to six bathroom breaks, and five to seven cigarette breaks, per six-hour shift.) Stewart admits that Happy Herman's also accommodated the needs of other employees with physical problems. These accommodations included allowing an employee with knee problems to sit on a stool at his cash register, and allowing a diabetic employee to take her lunch break at times of her choosing in accordance with her medical needs.

In addition to the foregoing, Stewart benefitted from Happy Herman's provision of a thirty

minute paid lunch break to all of its cashiers. Stewart acknowledges, however, that the paid lunch break was often disturbed because of the need to assist customers at the cash registers. As a result, Stewart's paid lunch break generally lasted closer to twenty-five minutes.

On April 27, 1993, Stewart's situation at Happy Herman's took a turn for the worse. Stewart's immediate supervisor, Guy Cassingham, approached her and told her that the paid lunch breaks would henceforth be fifteen minutes. According to Happy Herman's, Cassingham did so because Stewart's breaks were becoming excessively long—in the range of forty to fifty minutes. In response to the news about the changed break policy, Stewart promptly told Cassingham, "Yeah right, kiss my ass; sure." After ascertaining that Cassingham was serious and that the policy was being implemented at Levine's direction, Stewart responded, "Then he [Levine] can kiss my ass too."

At the end of her shift, Stewart went to see Levine and told him that fifteen minutes was not enough time to eat. Either later that day or the following day, Stewart also told Levine that the change in the lunch break policy was "causing her physical problems." It does not appear that Stewart was more specific about the nature of the physical problems—*i.e.,* whether the new break policy aggravated conditions arising from her radical pelvic surgery or whether it caused new unrelated physical problems. Stewart did, however, attempt to give Levine a note from her doctor to buttress her claim. Levine, who was conducting a meeting in his office when Stewart approached him, refused the note at the time, although Stewart concedes that the note eventually ended up in her personnel file.[1] Levine also declined to discuss the break policy with Stewart beyond simply telling her that the break policy had always provided for fifteen minutes of paid break time.

Following the exchange with Levine, Stewart discussed the fifteen minute break policy with her coworkers and told them of her desire to get a thirty minute paid break for all employees. According to Stewart, her coworkers "more or less nominated" her to pursue a thirty minute break policy. Stewart then proceeded to meet with several Happy Herman's management officials to discuss the break policy. During these meetings Stewart also attempted, largely without success,

---

[1]During discovery it was revealed that the note related to a reaction Stewart was having to a skin allergy medicine.

to raise other topics like the recycling of food, giving food to homeless shelters, a first-aid kit, a wet floor sign, a rain mat and "a number of other positive social changes."

On one of these occasions Stewart met with Ann Marie Moraitakis, a senior management official with supervisory responsibilities for all of Happy Herman's employees. Stewart told Moraitakis that she needed and wanted a thirty minute break because she couldn't eat within a shorter time period. Stewart also asked Moraitakis what the Happy Herman's policy was regarding breaks and asked Moraitakis to post the policy in writing. Moraitakis responded that the policy was that employees could take paid breaks of between fifteen and twenty minutes, or could clock out and take up to sixty minutes unpaid break time. Moraitakis also subsequently posted the break policy as Stewart requested.

The posted policy indicated that employees were entitled to a twenty minute paid break for an eight-hour shift. When Stewart later complained that the posted policy excluded her because she only worked a six-hour shift, Moraitakis amended the posted policy to read as follows:

> THE FOLLOWING IS THE STATEMENT OF THE POLICY REGARDING MEAL BREAKS FOR EMPLOYEES, WITH WHICH YOU ARE EXPECTED TO COMPLY:
>
> 1. HAPPY HERMAN'S PROVIDES IT'S [sic] EMPLOYEES WITH ONE PAID TWENTY (20) MINUTE BREAK FOR MEALS PER SIX TO EIGHT HOUR SHIFT. EMPLOYEES DO NOT HAVE TO CLOCK OUT OR CLOCK IN TO TAKE THIS 20 MINUTE BREAK.
>
> 2. EMPLOYEES WHO WISH TO TAKE LONGER THAN 20 MINUTES FOR MEALS MAY DO SO ONLY UPON THE FOLLOWING CONDITIONS:
>
> A) EMPLOYEES MUST CLOCK OUT AT THE BEGINNING OF THEIR MEAL BREAK AND CLOCK BACK IN AT THE END OF THEIR MEAL BREAK.
>
> B) NO MEAL BREAK MAY EXCEED SIXTY (60) MINUTES.
>
> 3. REGARDLESS OF LENGTH OF MEAL BREAK, NO EMPLOYEE MAY TAKE MEAL BREAKS UNLESS THEY ARE SCHEDULED IN ADVANCE WITH SUCH EMPLOYEE'S SUPERVISOR.

The day after the policy was originally posted, Stewart issued a five-page flyer to all Happy Herman's employees. Stewart entitled the flyer "Food for Thought: The Fifteen Minute War." In the flyer Stewart alternately praised Happy Herman's for changing its policy and accused Happy Herman's of engaging in "inhumane, unhealthy, unprofitable, and illegal conduct." The flyer also compared Happy Herman's treatment of its employees with the local municipality's treatment of

incarcerated criminals. With respect to the break issue in particular, Stewart's flyer stated:

> Today the formal policy concerning meal breaks was posted. The break period was increased from 15 minutes to 20 minutes in accordance with my closed door negotiations with Ann Marie Moraitakis and David Levin [sic] (5/4/93). This is an extremely positive step in the right direction. According to Ms. Moraitakis the policy has been in effect at least since 1978-1979, without revision or modification, and that there are no exceptions ... The additional 5 minutes is a positive step in the negotiation process towards a fair and equitable 30 minute break per 7-10 hr. shift. It shows that management is willing to reconsider their former position and it is the first break time increase in 14 years.... We only have 10 more minutes to go in our negotiation process. I applaud the "new policy". It is 2/3 of what is needed for a humane resolution, before it was only 1/2. Employees now have the "right" to clock out if they need to for an additional 40 minutes. For the first time policy is "posted". Ms. Moraitakis said that Happy Herman's was, "a good company" ... with Management empathy and Employee imput *we* could become a *great* company.

Stewart's flyer also stated:

> It is my sincere hope that management will understand that hungry, tired employees are not an asset to customer service or safety factors. And that this issue also contributes to employee disatisfaction [sic] and high turnover. It's not good business.... I am no longer angry ... or ashamed. But I am determined that Happy Herman's allow every employee (including management) to have an on clock 1/2 hr. break per 7-10 hr. shift. This is a reasonable request and it is in the best interest of the company.

> Give us half the break that our city gives criminals.

> Sincerely, Teri another 20th. century wage slave.

Stewart also engaged in a number of conversations with Happy Herman's employees during which she referred to Happy Herman's managers as "petty tyrants" that she wanted to "disembowel," and on one occasion Stewart even told Levine that Happy Herman's managers were "petty tyrants." Happy Herman's responded to Stewart's conduct with a disciplinary warning, which it issued to her on May 19, 1993. This warning indicated that Happy Herman's considered Stewart's behavior evidence of "insubordination and activity that is not in the best interest of Happy Herman's." In addition, Levine instructed Stewart not to distribute further flyers.

Two days later, however, on May 21, 1993, Stewart issued a six-page flyer to all Happy Herman's managers. In this flyer, Stewart responded to the statements contained in her disciplinary warning and voiced additional concerns about working conditions and sanitation. Stewart also stated that "I greatly appreciate your concern in this matter, since my physical condition (for the first time in two years of employment) has begun to deteriorate ... due to lack of adequate breaks." Stewart entitled the last page of the flyer "Mission Statement" and indicated that her objective was

"[t]o help management and employees reach a workable compromise concerning meal breaks."

Slightly more than a week later, on June 4, 1993, Happy Herman's management again met with Stewart to discuss the lunch break issue and Stewart's disciplinary warning. During this meeting, Happy Herman's managers informed Stewart that she could take an uninterrupted twenty minute paid lunch break if she so desired. Contemporaneous notes from the meeting also indicate that Happy Herman's offered Stewart shorter shifts, a leave of absence and planned break time in order to aid her with health problems. Happy Herman's also told Stewart that the disciplinary warning would remain in her file. Stewart contends that she thereafter received an uninterrupted break on only two occasions. Stewart's contemporaneous private journals, however, reflect that she experienced interruptions during her break on only three additional occasions.

During the same time period as Stewart's negotiations with Happy Herman's management, Levine began to request Stewart's discharge. According to Levine, he made his requests because he found Stewart insubordinate and was concerned that her conduct was affecting employee morale. Levine also expressed concern that Stewart was engaging customers in her disputes with Happy Herman's management. On June 16, 1993, this concern appeared to be validated in a dramatic way, as Stewart—in front of a Happy Herman's customer—refused a supervisor's instruction to issue a refund. Stewart claims that she refused to do so in accordance with company policy, but she provides no company policy guideline to buttress her claim in this respect. Also during the month of June, Stewart reported Happy Herman's to the Health Department, Department of Agriculture, Georgia Power and the Building Inspector. Soon thereafter, on June 29, 1993, at Levine's request, Happy Herman's discharged Stewart for insubordination.

Although the cause listed on Stewart's discharge notice was insubordination, Stewart contends that Happy Herman's management never told her which of her actions were insubordinate. Stewart also contends that the various acts that Happy Herman's cited as the basis for her discharge have shifted in post-termination proceedings before the Georgia Unemployment Board and the National Labor Relations Board.

Stewart brought this lawsuit against Happy Herman's and a number of Happy Herman's

employees and affiliated entities on March 1, 1995. Stewart's lawsuit included claims for relief under the ADA for discrimination and retaliation. On October 30, 1995, Happy Herman's and the other defendants moved to dismiss for want of prosecution, or, in the alternative to compel discovery responses, impose sanctions and grant attorney's fees. The district court held the motion for sanctions in abeyance at that time, but granted other relief not relevant to this appeal. Following the close of discovery, the district court granted summary judgment to Happy Herman's on May 13, 1996. In so ruling, the district court found that Stewart failed to establish that she is substantially limited in one or more major life activities, and that she failed to offer sufficient evidence to show that Happy Herman's discharged her for pretextual reasons. On May 28, 1996, Happy Herman's renewed its motion for sanctions and attorney's fees in the amount of $4,408.50. Stewart failed to respond to the renewed motion. On July 30, 1996, the district court noted that under local rule 220-1(b) for the Northern District of Georgia the motion was unopposed, and granted the requested relief. Stewart filed this appeal.

## ISSUES

Stewart raises three issues on appeal: (1) whether the district court erred in granting summary judgment to Happy Herman's on her discrimination claim; (2) whether the district court erred in granting summary judgment to Happy Herman's on her retaliation claim; and (3) whether the district court erred in granting Happy Herman's sanctions and attorney's fees.

## CONTENTIONS

We find Stewart's arguments on these issues unpersuasive, and discuss only the first two issues.[2]

Stewart contends that summary judgment was inappropriately granted in this case. She contends, *inter alia,* that she is disabled because (1) she cannot stand for long periods or lift heavy objects; (2) she needs to urinate frequently; and (3) needs to take prescription medicine for pain

---

[2]We affirm with respect to the third issue pursuant to Eleventh Circuit Rule 36-1.

arising from her radical pelvic surgery.[3]  According to Stewart, this disability constitutes a substantial limitation on her ability to perform major life activities such as working, walking, lifting, sitting and standing.  Stewart further contends that she was discriminated against because of her disability in that Happy Herman's could have easily accommodated her with the thirty minute paid lunch break she requested.  In addition, Stewart contends that Happy Herman's illegally retaliated against her, subjecting her to repeated discipline because she requested accommodation.  Stewart further argues that her employer's claim that it discharged her for insubordination is pretextual.  Stewart bases this argument on the allegedly "suspect timing" of her discharge and on the allegedly varying reasons for discharging her.  Stewart also contends that she presented uncontroverted evidence of other adverse treatment occurring prior to her discharge that could sustain a finding of retaliation in this case.

Happy Herman's contends that summary judgment was properly granted in this case because Stewart failed to show that she is substantially limited in the major life activity of working.  Happy Herman's further contends that the other so-called life activities Stewart identifies (*e.g.,* standing and lifting) are merely cited as evidence of Stewart's limitations with respect to working.  According to Happy Herman's, Stewart's work history proves that her various conditions merely interfered with her ability to perform a particular job and did not substantially limit her ability to obtain other satisfactory employment or to perform a class of jobs.  As a result, Happy Herman's claims, Stewart failed to establish a necessary prerequisite for liability to arise under the ADA. Happy Herman's also argues that it reasonably accommodated Stewart as a matter of law, and that this court can affirm the grant of summary judgment on "reasonable accommodation" grounds even though the district court did not reach that issue.  Finally, Happy Herman's contends that it legitimately discharged Stewart for multiple acts of insubordination.

## DISCUSSION

A. *Standard of Review*

---

[3]Stewart also contends that she is disabled because of her inability to reproduce.  Because we ultimately resolve this case on grounds not related to the existence of Stewart's disability, we need not discuss this contention.

We review a district court's grant of summary judgment *de novo* applying the same standards as the district court. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996). Summary judgment is appropriate if the pleadings, depositions and affidavits show that no genuine issue of material fact exists for trial and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510-11. When assessing the sufficiency of the evidence in favor of the nonmoving party, we must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir.1993). We are not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510-11. Moreover, we may affirm the district court's grant of summary judgment on any adequate ground, even if it is other than the one on which the district court actually relied. *Parks v. City of Warner Robins,* 43 F.3d 609, 613 (11th Cir.1995).

B. *Stewart's ADA Claims*

1. The ADA Discrimination Claim

The Americans with Disabilities Act of 1990, as amended in the Civil Rights Amendments Act of 1991, 42 U.S.C. § 12101 *et seq.,* prohibits covered employers from discriminating based upon the known physical or mental impairments of a qualified individual with a disability. 42 U.S.C. § 12112. "Indeed the ADA imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship upon the employer." *Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996) (citation omitted).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that she: (1) has a disability; (2) is a qualified individual; and (3) was unlawfully subjected to

discrimination because of her disability. *Morisky,* 80 F.3d at 447. Whether an individual has a "disability" within the ADA's purview turns on a determination of whether the individual has: a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or is regarded as having such an impairment. 42 U.S.C. § 12102; *Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 (11th Cir.), *amended on reh'g,* 102 F.3d 1118 (11th Cir.1996). When individuals claim that they are substantially limited in the major life activity of "working," their condition "must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities." *Pritchard,* 92 F.3d at 1133 (internal quotations and citations omitted). "An impairment does not substantially limit the ability to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs. Nor does the inability to perform a single, particular job ... constitute a substantial limitation in the major life activity of working." *Pritchard,* 92 F.3d at 1133 (internal quotations and citations omitted).

As suggested above, a qualified individual with a disability may be unlawfully discriminated against because of the individual's disability when the individual's employer does not reasonably accommodate the disability—unless such an accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A). Under the ADA, the term "reasonable accommodation" may include, *inter alia,* "job restructuring, parttime or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). This list notwithstanding, "[t]he use of the word "reasonable' as an adjective for the word "accommodate' connotes that an employer is not required to accommodate an employee in any manner in which that employee desires." *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 947 (N.D.Ga.1995). This is so because the word "reasonable" would be rendered superfluous in the ADA if employers were required in every instance to provide employees "the maximum accommodation or every

conceivable accommodation possible." *Lewis,* 908 F.Supp. at 947; *see also Vande Zande v. State of Wis. Dept. of Admin.,* 851 F.Supp. 353, 360 (W.D.Wis.1994) ("an employee is entitled only to a reasonable accommodation and not to [a] preferred accommodation"), *aff'd,* 44 F.3d 538 (7th Cir.1995). Stated plainly, under the ADA a qualified individual with a disability is "not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Lewis,* 908 F.Supp. at 948.

Moreover, the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. *Willis v. Conopco,* 108 F.3d 282, 283 (11th Cir.1997).

The district court in this case never reached the "reasonable accommodation" issue, as it found, in part, that Stewart was not substantially limited in the major life activity of working. On appeal, Happy Herman's urges us to affirm the district court's analysis and, in the alternative, to find that it reasonably accommodated Stewart. We accept the suggestion to affirm on the alternative basis. We do so because the record clearly reveals that Happy Herman's met its burden to accommodate Stewart's disability.

The uncontroverted record in this case demonstrates that prior to any change in break policy Stewart effectively had a twenty-five minute paid lunch break that was subject to interruption if the store was busy. Stewart managed to perform her duties with no special accommodation under this break policy for more than a year. After the "new" break policy went into effect, Happy Herman's ultimately offered Stewart multiple accommodations which presented her a broad range of work options. Specifically, Happy Herman's offered Stewart: (1) a paid break that was five minutes shorter than her previous break, but not subject to any interruption; (2) an unpaid break of up to sixty minutes; (3) shorter work shifts to obviate the need for a lunch break altogether; (4) a leave of absence; and (5) planned break time in order to aid her with health problems. Happy Herman's made these accommodation offers despite the fact that Stewart made her requests for accommodation to management in a manner that can only be described as highly confrontational.

Rather than accept the Happy Herman's accommodation offers or explain with some specificity why they were all unreasonable in light of her medical condition, Stewart admits that she took on the role of ad hoc employee negotiator for a thirty minute break for all employees, as well as the role of general lobbyist for "positive social change" at Happy Herman's.

Whatever the obligations of an employer are under the ADA to accommodate an employee, they do not extend to engaging in generalized negotiations with an employee concerning the employer's workplace rules and policies for all employees. As we have stated before, the ADA is "remedial in nature—ensuring that those with disabilities can fully participate in all aspects of society, including the workplace." *Willis,* 108 F.3d at 285. The ADA thus requires that employers reasonably accommodate qualified individuals with a disability, not that employers negotiate with disabled individuals on behalf of all workers, disabled or not. *See* 42 U.S.C. § 12111(9)(B) (discussing accommodations that must be offered "for *individuals with disabilities* ") (emphasis added).

In this case, Stewart clearly crossed the line from seeking an accommodation on her own behalf to becoming an advocate on behalf of a policy goal—thirty minutes of paid break time for all Happy Herman's employees. Happy Herman's nonetheless still attempted to accommodate Stewart's individual needs and offered her no less than five different accommodations. To the extent that the ADA requires an employer in some limited circumstances to engage in an "interactive process" with the disabled employee, Happy Herman's met its burden in that regard. *See Beck v. Univ. of Wis. Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996) (under the ADA regulations it may be necessary for an employer to engage in an informal interactive process with the individual in need of an accommodation). The record is clear that Stewart failed to engage Happy Herman's in an interactive process after it offered accommodations, in that she did not provide Happy Herman's with any substantive reasons as to why all five of the proffered accommodations were unreasonable given her medical needs. Instead, Stewart simply demanded that Happy Herman's capitulate and provide a thirty minute paid break for her and all of her coworkers.

Under these circumstances, no reasonable juror could find in Stewart's favor, and summary

judgment is thus appropriate. Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process. *Cf. Beck,* 75 F.3d at 1137 ("liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown"); *Willis,* 108 F.3d at 283 (an ADA plaintiff has the burden of proving that an accommodation is reasonable).

2. The ADA Retaliatory Discharge Claim

The ADA also provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. Accordingly, we assess ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII. *McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1075-77 (11th Cir.1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case), *cert. denied,* --- U.S. ----, 117 S.Ct. 1819, --- L.Ed.2d ---- (1997). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993) (explaining requirements to show retaliation in the Title VII context). Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation. *See Goldsmith,* 996 F.2d at 1163. The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation. *Cf. Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 440 (11th Cir.1996).

In this case, the district court found that Stewart established a *prima facie* case, but failed to rebut Happy Herman's assertion that it legitimately fired Stewart for insubordination. We agree

that Stewart failed to rebut Happy Herman's non-discriminatory explanation for discharging her.

Stewart argues that the district court erred in two respects. First, she contends that an inference of retaliation arises in this case because of the timing of her discharge and because Happy Herman's provided varying reasons for her termination. This claim is meritless. It is undisputed that the numerous acts of alleged insubordination in this case occurred around the same time period as Stewart's request for accommodations. Indeed, Stewart admits doing most of the acts at issue. No inference of retaliation based on "suspect timing" arises under these particular circumstances. *Cf. Severino v. North Fort Myers Fire Control Dist.,* 935 F.2d 1179, 1183( 11th Cir.1991) (finding that the Rehabilitation Act does not subject employers to liability for maintaining appropriate discipline in the workplace even when the discipline is directed at a handicapped individual). We are also unpersuaded that Stewart could prevail before a jury on her pretext claim based on the alleged "varying explanations." The discharge notice in this case stated only that Stewart was discharged for "insubordination." Happy Herman's later provided different examples of Stewart's alleged insubordination to the Georgia Unemployment Board and the National Labor Relations Board. The explanation that Happy Herman's proffered, though, remained unvarying: it discharged Stewart for insubordination. Under these circumstances no question of pretext arises. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1534-35 (11th Cir.1997) (employer entitled to judgment as a matter of law when the reasons for the employer's action remain unrebutted).

Stewart's second contention is that the district court overlooked other adverse acts which occurred prior to her discharge, such as Happy Herman's managers denying Stewart the right to take accrued vacation time to extend her breaks. We agree that the district court did not address these alleged acts, but find that Stewart cannot rely on the district court's oversight to defeat the grant of summary judgment in this case. In our view, the acts Stewart describes relate directly to her "reasonable accommodation" discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue.

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment and its

award of sanctions and attorney's fees.

AFFIRMED.