William L. LUCAS, Plaintiff-Appellant,

v.

W.W. GRAINGER, INC., Defendant-Appellee.

No. 00-14323.

United States Court of Appeals,

Eleventh Circuit.

July 17, 2001.

Appeal from the United States District Court for the Northern District of Georgia. (No. 97-03837-CV-CAP-1), Charles A. Pannell, Jr., Judge.

Before CARNES, COX and NOONAN[*], Circuit Judges.

CARNES, Circuit Judge:

William Lucas appeals the district court's grant of summary judgment in favor of W.W. Grainger, Inc. on his claims under the Americans with Disabilities Act. He contends the district court erred in concluding that he was not disabled within the meaning of the statute. He also contends the district court erred in concluding Grainger did not unlawfully retaliate against him for engaging in statutorily protected expression. On our way to affirming the district court's judgment, we address a number of issues about what constitutes reasonable accommodation and a few relating to retaliation.

**BACKGROUND**

Grainger is an industrial commercial supply company that distributes maintenance, repair, and operating products from warehouses that it operates throughout the United States. On May 22, 1993, Grainger hired the plaintiff, William Lucas, to work as a Material Handler at its Marietta Boulevard facility in Atlanta.

Though Lucas was hired as a Material Handler, he began training for the position of Will-Call Service Representative soon after he was hired. Like Material Handler, the Will-Call job consists primarily of performing physical labor in Grainger's warehouse. However, unlike Material Handler, the Will-Call job also involves a significant amount of interaction with Grainger's customers, and it is considered a promotion from Material Handler. Grainger describes the job duties of a Will-Call Service Representative as follows:

> When a customer places an order with a Customer Service Representative, a purchase order is delivered to the Will-Call Service Representative, who picks [up] and delivers the product from the

[*]Honorable John T. Noonan, Jr., U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

warehouse ... to the customer upon the customer's arrival at the branch. Will-Call Service Representatives ... are also required to work in the warehouse on a daily basis, which includes performing such functions as receiving freight, stocking products, pulling orders, loading outbound trailers, and performing maintenance activities in the warehouse. The essential functions ... include, among other things, bending, stooping, climbing, carrying, reaching, pushing, pulling, lifting up to seventy pounds on a regular basis, and operating power equipment. Lifting more than ten pounds is an essential function....

Lucas trained for the Will-Call job for several months after he was hired, although his actual job title remained Material Handler. By April of 1994, though, Grainger needed someone to handle customer telephone calls at the Marietta Boulevard facility, and it decided to train Lucas for the job of Customer Service Representative instead. The Customer Service Representative position is essentially a desk job, and Lucas trained for it by performing duties such as taking orders from customers over the phone, and filling out paperwork. The job is considered a promotion from both Material Handler and Will-Call Service Representative.

Lucas performed primarily Customer Service Representative duties for much of 1994. During that time, several customers complained about his phone demeanor. For example, one customer complained to Grainger that Lucas had spoken to him in a degrading fashion and that customer said he would not do business with Grainger as long as Lucas was answering the phone. Due to the complaints, Grainger decided Lucas was not cut out to be a Customer Service Representative, and moved him back to working in the warehouse, where he had less customer contact than he had during his training for the Customer Service Representative job.

On October 15, 1994, Grainger officially promoted Lucas to the position of Will-Call Service Representative, and he held that title during the remainder of his employment with Grainger.

In May of 1996 Lucas injured his back while unloading a trailer. After seeing a doctor about the injury, he told his boss, Paul Stewart, who worked as the Branch Manager at the Marietta Boulevard facility, that his doctor had placed him on complete bed rest. Lucas also told Stewart that he would be unable to return to work until June 3, 1996 and that, upon returning to work, he would have to abide by certain work restrictions, including lifting no more than ten pounds and refraining from repetitive bending or stooping for two weeks.

Stewart promptly placed Lucas on short-term medical leave, and informed him that when he returned to work Grainger would try to temporarily assign him to duties that did not interfere with his work restrictions. Stewart also told Lucas that he would eventually have to return to his Will-Call job, and reminded him that, due to previous customer complaints, Grainger would not assign him to a Customer

Service Representative position on a regular basis.

On June 12, 1996, Lucas returned to work and presented a note from his doctor to Grainger. The note permitted Lucas to perform office work, i.e., work that did not entail manual labor, so long as he adhered to certain work restrictions. At the time, there were no openings at the Marietta Boulevard facility for office jobs, so Stewart temporarily displaced two employees from their jobs in order to allow Lucas to take over their office duties. The displaced employees performed the warehouse duties that Lucas would have performed as a Will-Call Service Representative, while Lucas performed office duties exclusively.

On June 20, 1996, Lucas informed Grainger that he had developed degenerative disk disease and lumbar disk syndrome in his back. The next day, while he was performing his temporary office duties, Lucas told a manager at Grainger that he could barely keep his eyes open and felt "knotted up inside." Lucas left work early that day, and he did not return for several days.

When he returned to work on June 26, 1996, Lucas made a request to Stewart for an accommodation in the form of a permanent job that entailed "desk work." This was the first time Lucas requested an accommodation for his back impairment from Grainger, although he subsequently made the same request on at least one other occasion. At that time there were no desk jobs available at the Marietta Boulevard facility, so Stewart inquired into job openings at Grainger's other Atlanta facilities. Eventually, Stewart was able to arrange three job interviews for Lucas. The three positions, which all existed outside of the Marietta Boulevard facility, were Quotations Specialist, Branch Support Specialist, and Support Specialist for Grainger's Lockheed account. Lucas testified in his deposition that he applied for these three positions because he was under the impression that they did not require physical labor.

Lucas interviewed for each of the three positions, but he was not selected to fill any of them. According to Grainger, Lucas either was not qualified or was not the most qualified person who applied for each one. The individuals who interviewed and evaluated Lucas for the positions did not consider his work restrictions in deciding not to select him.

Around July 8, 1996, Lucas notified Stewart that his doctor had yet to release him from his work restrictions, and that the doctor had recommended he permanently perform "light duty" work in order to avoid further injuring his back. Lucas also informed Stewart that he would never work in the warehouse again, even if he became physically able to do so, because he was afraid it might further injure his back. Stewart responded by reminding Lucas that his office assignment was temporary and that no permanent office jobs were available at the Marietta Boulevard facility.

Four days later Lucas informed Stewart that his back impairment had not improved and said that he could not and would not perform warehouse work. Grainger then placed Lucas on workers' compensation leave effective July 15, 1996, and Lucas began receiving workers' compensation benefits. On January 8, 1997, Lucas filed a discrimination charge with the Equal Employment Opportunity Commission.

Lucas remained on workers' compensation leave for nearly one year. Then, in June of 1997, Grainger offered him a job as a Bins Sorter at its Zone Distribution Center ("Distribution Center") in Atlanta. Grainger had created the Bins Sorter position by identifying certain duties from existing jobs at the Distribution Center, and combining those duties into a job that Grainger felt Lucas could perform given his work restrictions. The Bins Sorter job entailed sorting small bin items from a cart and placing them on racks, as well as using a scan gun to identify the items by bar code.

Lucas visited the Distribution Center in order to learn more about the Bins Sorter job first-hand. Thereafter, Grainger sent a typed form entitled "Job Description" to Lucas' physician, Dr. Christopher Clare. The form briefly described what it called the "Essential Job Functions" of the Bins Sorter position, listed the job's physical requirements, and indicated that modifications to those requirements were possible.

Dr. Clare made some changes to the Essential Job Functions part of the Job Description form. First, where the form indicated that a Bins Sorter was "occasionally" required to squat or kneel, Dr. Clare entered "Not at all." Second, where the form indicated that a Bins Sorter was "occasionally" required to lift or carry "up to 40-50 lbs.," and was "frequently" required to lift or carry "up to 10-25 lbs.," he again entered "Not at all." Dr. Clare then checked a blank space marked "Approved" at the bottom of the form, signed the form, and returned it to Grainger in September of 1997.

The district court found that by making these changes to the Job Description form, Dr. Clare approved Lucas for the Bins Sorter position with minor modifications that were consistent with the job's essential functions. Lucas, on the other hand, claims Dr. Clare rejected the Bins Sorter job because its minimum requirements exceeded his work restrictions. He also claims that sometime after he visited the Distribution Center, Dr. Clare's office called and informed him that he had not been approved for the Bins Sorter position.

Grainger did not offer Dr. Clare's modified version of the Bins Sorter position to Lucas. In fact, after Lucas visited the Distribution Center, he and Grainger had no further contact regarding the Bins Sorter position or any other position. Lucas maintains that he would have accepted the modified Bins Sorter position if Grainger had offered it to him.

Lucas never returned to work with Grainger after he went on workers' compensation leave; instead, in March of 1998 he began working for a different company as an admissions inspector.

On December 29, 1997, Lucas sued Grainger in the Northern District of Georgia, alleging that Grainger had violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.,* by discriminating against him on the basis of his impairment, by harassing him[1], and by unlawfully retaliating against him. Lucas sought back pay, declaratory relief, reinstatement, front pay in lieu of reinstatement, and compensatory and punitive damages.

Grainger responded by filing a motion for summary judgment, which the district court granted on July 14, 2000. The court concluded that Lucas was not "disabled" within the meaning of the ADA and, therefore, could not establish a prima facie case for discrimination or for harassment. As for Lucas' claim of unlawful retaliation, the court determined that he had failed to establish a causal link between a statutorily protected expression and any of Grainger's alleged adverse employment actions. Accordingly, the district court dismissed all of Lucas' claims and entered summary judgment in favor of Grainger.

## DISCUSSION

We review the district court's grant of summary judgment *de novo,* and apply the same standards as that court. *See Blake v. American Airlines, Inc.,* 245 F.3d 1213, 1215 (11th Cir.2001).

### A. LUCAS' ADA DISCRIMINATION CLAIM

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) he is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability. *See Reed v. Heil Co.,* 206 F.3d 1055, 1061 (11th Cir.2000).

An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability—unless doing so would impose

---

[1]Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal. *See, e.g., Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1317 n. 17 (11th Cir.1999).

undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). An accommodation can qualify as "reasonable," and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job. *See LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir.1998). The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir.1997); *Willis v. Conopco, Inc.,* 108 F.3d 282, 283 (11th Cir.1997).

The ADA lists as examples of reasonable accommodations "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); *see* 29 C.F.R. § 1630.2(*o*)(2)(ii). As the list indicates, the ADA may require the employer to "reassign," i.e., transfer, the disabled employee to a vacant position as a reasonable accommodation. The reassignment duty, however, does not require the employer to bump another employee from a position in order to accommodate a disabled employee. *See Willis,* 108 F.3d at 284. Nor does it require the employer to promote a disabled employee. *See EEOC v. Humiston-Keeling, Inc.,* 227 F.3d 1024, 1029 (7th Cir.2000); *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011, 1019 (8th Cir.2000); *Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir.1998); *Shiring v. Runyon,* 90 F.3d 827, 832 (3d Cir.1996); *see also Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir.1998) (citing *White v. York Int'l Corp.,* 45 F.3d 357, 362 (10th Cir.1995)); 29 C.F.R. pt. 1630, App. § 1630.2(*o*) ("It should also be noted that an employer is not required to promote an individual with a disability as an accommodation.").

The district court determined that Lucas had not established a triable issue as to whether he was disabled, and granted summary judgment in favor of Grainger on his discrimination claim. We need not decide whether the district court properly resolved that issue if there is another basis for affirming its judgment, because we may affirm its judgment "on any ground that finds support in the record." *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957); *see Stewart,* 117 F.3d at 1286. Assuming, without deciding, that Lucas' back impairment rendered him disabled, the district court's grant of summary judgment is still due to be affirmed, because Lucas has failed to put forth evidence sufficient for a reasonable jury to find that Grainger discriminated against him because of his disability.

Lucas contends that Grainger discriminated against him by failing to reasonably accommodate his

disability. According to Lucas, the ADA required Grainger to accommodate his disability by doing one of the following: (1) reassigning him to a Customer Service Representative position at the Marietta Boulevard facility; (2) giving him one of the three positions for which he interviewed; (3) reassigning him to the Distribution Representative position at the Distribution Center; or (4) restructuring the Bins Sorter position in accordance with Dr. Clare's changes on the Job Description form and offering him that position.[2]

1.    *The Customer Service Representative Position*

Lucas contends that Grainger discriminated by not reassigning him to the Customer Service Representative position at the Marietta Boulevard facility. We find no merit to this argument, because even if we assume (as we probably should not) that Lucas was otherwise qualified to perform the duties of that position notwithstanding the prior customer complaints about his lack of interpersonal skills, there were no vacancies in that position, or in any other position involving desk work, at the Marietta Boulevard facility. Indeed, the lack of vacancies there is what prompted Stewart to set up interviews for Lucas at Grainger's other Atlanta facilities. Because there was no vacancy at the Marietta Boulevard facility for Customer Service Representative, reassigning Lucas to that position would have required Grainger to bump another employee from it, and that is not required by the ADA.[3] *See Willis,* 108 F.3d at 284.

Even if there had been an opening for Customer Service Representative at the Marietta Boulevard facility, Grainger would not have been required under the ADA to reassign Lucas to that position. Customer Service Representative is a step up from Material Handler and from Will-Call Service Representative; it

---

[2]Lucas contends that Grainger failed to engage him in an "interactive process" with the aim of identifying an accommodation that might allow him to continue working at Grainger after he became disabled. *See* 29 C.F.R. § 1620.2(*o*)(3). However, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *See Willis,* 108 F.3d at 285 (citation omitted); *accord Kennedy v. Dresser Rand Co.,* 193 F.3d 120, 122 (2d Cir.1999) (summary judgment is appropriate where the plaintiff fails to identify a reasonable accommodation that the defendant refused to provide). In other words, regardless of whether the ADA required Grainger to engage Lucas in an interactive process, Lucas' discrimination claims fail unless he can show that an accommodation reasonably could have been made. The ADA is not intended "to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." *Willis,* 108 F.3d at 285.

[3]The record reveals that when Stewart provided Lucas with a temporary office position in June of 1996, which was just before Lucas first requested to be accommodated with a permanent desk job, Stewart displaced two other employees from their office duties and had them perform Lucas' Will-Call job duties. That was more than the ADA required. Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so. *See Terrell,* 132 F.3d at 626 n. 6 ("An employer that bends over backwards to accommodate a disabled worker ... must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.") (internal marks and citation omitted).

would have been a promotion for Lucas. The ADA does not mandate that employers promote disabled employees in order to accommodate them, *see, e.g., Humiston-Keeling,* 227 F.3d at 1029, so Grainger's failure to reassign Lucas to that job was not discrimination under the ADA.

2.      *The Three Positions for Which Lucas Interviewed*

Lucas next contends that Grainger discriminated against him by not reassigning him to one of the three positions he interviewed for in June and July of 1996. He insists that there is a genuine issue of material fact as to whether he was qualified to do those jobs. Be that as it may, as we have already explained, the ADA does not require an employer to promote a disabled employee in order to accommodate him. The individuals who interviewed Lucas for the three jobs, as well as Stewart, all testified that the jobs would have been promotions from the Will-Call Service Representative position, and Lucas offered no evidence to the contrary. Therefore, Grainger did not discriminate against Lucas by failing to reassign him to one of the three positions for which he interviewed.[4]

3.      *The Distribution Representative Job*

Lucas also contends that Grainger discriminated against him by not reassigning him to the Distribution Representative position at the Distribution Center.[5] That position became vacant sometime in the summer of 1996, when the person who held it was promoted to Branch Support Specialist, which was one of the jobs Lucas had interviewed for but had not gotten. Gary Powers, who managed the Distribution

---

[4]Grainger's motion for summary judgment characterized the three positions as "alternative employment opportunities that were reasonably available...." Lucas maintains that, "as a matter of policy," Grainger's characterization of the three positions in its summary judgment motion ought to preclude it from arguing on appeal that placing him in those positions was not required under the ADA. But Grainger's characterization of the positions simply acknowledges that they were "reasonably available" in the sense that there was a vacancy in each one, and it does not speak to the issue of whether a promotion of Lucas to any of those three positions was an accommodation Grainger was required to provide under the ADA.

[5]Lucas also argues that Grainger was required under the ADA to reassign him to several other positions that were available at the Distribution Center, but he does not identify any of them. Instead, he cites in his brief to the deposition testimony of Gary Powers, who managed the Distribution Center. Powers testified that he was "sure" there were "several positions" open at the Distribution Center in the summer of 1996, including "warehousing, night crew, receiving, picking, [and] packing," and that the majority of those jobs were part-time. This testimony, which consists solely of Powers' speculation regarding the existence of vacant positions at the Distribution Center, falls far short of the evidence needed to establish that a specific reasonable accommodation, in the form of a vacant position, actually existed at the Distribution Center. *See Willis,* 108 F.3d at 286 ("[E]stablishing that a reasonable accommodation exists is a part of an ADA plaintiff's case."). Further, Lucas offered no evidence that he was "otherwise qualified" for those unidentified jobs; he put forward no evidence that he could have performed the essential functions of whatever jobs there were with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8).

Center, testified in his deposition that the Distribution Representative job involved "some office duties ... as well as ... performing some of the duties on the packing station line," including "[p]reparing orders for shipment, [and] so forth." According to Powers, the job required physical labor.

In order to have survived Grainger's motion for summary judgment on his discrimination claim, Lucas must have put forth evidence sufficient for a jury to find that he was "a qualified individual with a disability"—i.e., that he was "otherwise qualified" for the Distribution Representative job. *See Stewart,* 117 F.3d at 1285; *Duckett v. Dunlop Tire Corp.,* 120 F.3d at 1222, 1225 (11th Cir.1997). He was "otherwise qualified" for that job if he could perform its essential functions with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8) ("The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."); *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir.2000). Our first task is to identify the essential functions of the Distribution Representative job.

Essential functions are "the fundamental job duties of the employment position the [disabled employee] holds or desires." 29 C.F.R. § 1630.2(n)(1). Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis. *See Davis,* 205 F.3d at 1305. We have previously stated that, in conducting this inquiry, "consideration shall be given to the employer's judgment ... and if an employer has prepared a written description ... for the job, this description shall be considered evidence of the essential functions of the job." *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1365 (11th Cir.2000) (quoting 42 U.S.C. § 12111(8)); *see also* 29 C.F.R. § 1630.2(n) (listing additional factors to consider in determining whether a particular job function is essential).

The evidence establishes without dispute that performing some of the duties on the packing station line, which includes preparing orders for shipment, is one of the essential functions of the Distribution Representative job. Performing those duties requires physical labor.[6] Lucas has failed to show he was "otherwise qualified" for the Distribution Representative position, because he has not satisfied his burden of

---

[6]In his brief, Lucas insists that physical labor is not essential to performing the duties of the Distribution Representative position, but he has failed to provide any evidence in support of that argument, and Granger has put in evidence to the contrary. *See Martinson v. Kinney Shoe Corp.,* 104 F.3d 683, 687 (4th Cir.1997) (adopting employer's judgment of essential function where plaintiff did not offer any evidence at the summary judgment stage to contradict that judgment); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir.1995) (same).

putting forth evidence that he could, with or without reasonable accommodation, perform the essential function of engaging in the physical labor necessary to prepare orders for shipment on the packing line. Not only that, but there is a bushel basket of evidence to the contrary: (1) in June of 1996 Lucas requested to be accommodated with a permanent desk job because he felt he was unable to perform physical labor in Grainger's warehouse due to his back injury; (2) Lucas testified in his deposition that he applied for the three jobs that Stewart had set up interviews for in June and July of 1996 because those jobs "didn't require physical labor"; (3) in July of 1996 Lucas informed Stewart that he would never work in Grainger's warehouse again—even if he became physically able to do so—because he did not want to risk further injury to his back; and (4) in September of 1997, Dr. Clare, Lucas' physician, modified the Job Description form for the Bins Sorter position to eliminate the duties of squatting, kneeling, lifting, and carrying because he felt that Lucas could not perform those duties with his back impairment. Viewing all of this evidence in the light most favorable to Lucas, we conclude that he has not created a triable issue about whether he was "otherwise qualified" for the Distribution Representative position.[7] *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *Duckett,* 120 F.3d at 1225; *Burch v. City of Nacogdoches,* 174 F.3d 615, 619 (5th Cir.1999) ("The law in this area is crystal clear: an otherwise qualified person is one who is able to meet all of the [job's] requirements in spite of his handicap.") (internal marks and citation omitted).

4. *The Bins Sorter Position*

Finally, Lucas contends that Grainger should have restructured the Bins Sorter position and offered it to him. He correctly points out that "job restructuring" is an accommodation the ADA may require the employer to make in some cases, *see* 42 U.S.C. § 12111(9)(B); but job restructuring is required only where it is reasonable, *see Terrell,* 132 F.3d at 626. Lucas says that if Grainger had restructured the Bins Sorter position in accordance with the changes Dr. Clare entered on the Job Description form, and had offered him that job, he would have accepted it.

An accommodation is "reasonable" and necessary under the ADA only if it enables the employee to perform the essential functions of the job. *See LaChance,* 146 F.3d at 835; *Willis,* 108 F.3d at 284. The

---

[7]Powers did testify that he believed there was "a possibility" Lucas was "minimally qualified" for the Distribution Representative job. Putting aside questions about the insubstantiality of a mere "possibility," the context in which this statement was made shows that Powers was talking about whether Lucas had developed the requisite job skills and experience to perform the Distribution Representative job, not whether he could physically withstand the demands of the job and thereby perform all of its essential functions with or without reasonable accommodation.

essential functions of the Bins Sorter position are described on the Job Description form that Grainger sent to Dr. Clare. The form states that the position's "Essential Job Functions" include sorting items from a cart and placing them on racks. According to the form, those functions required "occasionally"—meaning from 1 to 3 hours per shift—lifting or carrying items that weigh up to 40 to 50 pounds, as well as squatting or kneeling, and "frequently"—meaning from 4 to 6 hours per shift—lifting or carrying items that weigh up to 10 to 25 pounds. In Dr. Clare's opinion, Lucas' back impairment precluded him from doing any of those things, which is why Dr. Clare struck squatting, kneeling, lifting, and carrying from the list of job functions or activities on the form. But those were essential functions of the Bins Sorter position.

While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists. *See Earl,* 207 F.3d at 1367; *Holbrook v. City of Alpharetta,* 112 F.3d 1522, 1528 (11th Cir.1997); *Wells v. Shalala,* 228 F.3d 1137, 1145 (10th Cir.2000); *Donahue v. Consolidated Rail Corp.,* 224 F.3d 226, 232 (3d Cir.2000); *Lloyd v. Hardin County,* 207 F.3d 1080, 1084 (8th Cir.2000); *Robertson v. Neuromedical Ctr.,* 161 F.3d 292, 295-96 (5th Cir.1998); *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991). The difference between the accommodation that is required and the transformation that is not is the difference between saddling a camel and removing its hump. Restructuring the Bins Sorter position by eliminating squatting, bending, lifting, or carrying bin items would have changed the nature of the beast, and that is not something the ADA requires.[8]

### B. LUCAS' ADA RETALIATION CLAIM

The district court also granted summary judgment in favor of Grainger on Lucas' ADA retaliation claim. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ....

---

[8]Lucas also contends that the ADA required Grainger to restructure his Will-Call Service Representative job as a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B) (listing "job restructuring" as a possible reasonable accommodation). He maintains that Grainger could have restructured that job by, for example, instituting "reasonable physical lifting restrictions." However, performing physical labor in Grainger's warehouse was an essential—indeed the core—function of the Will-Call job, and Lucas either could not or would not perform that function. Lucas told Stewart that he would never work in the warehouse again, even if he became physically able to do so, because he did not want to risk further injuring his back. When asked in his deposition whether there was anything Grainger could have done after he injured his back to help him perform his warehouse duties, Lucas answered "no." Lucas either could not or would not perform the essential functions of the Will-Call Service Representative job and, therefore, he was not "otherwise qualified" to do it. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

under [the ADA]." 42 U.S.C. § 12203(a). In order to establish a prima facie case of retaliation, Lucas must show that: (1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression. *See Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir.1999); *Stewart,* 117 F.3d at 1287.

Lucas claims that he engaged in a statutorily protected expression on June 26, 1996, when he asked Stewart for an accommodation in the form of desk work and, again, on January 8, 1997, when he filed a charge with the EEOC. Moving straight to the second element of a prima facie case of retaliation, we conclude that Lucas has failed to produce sufficient evidence to permit a reasonable jury to find that Grainger took an adverse employment action against him.

Lucas maintains that Grainger took an adverse action against him when Stewart "actively solicited negative performance memoranda from several of ... Lucas' co-workers." In August of 1996, after Grainger had placed Lucas on workers' compensation leave, Stewart and two other members of Grainger's management at the Marietta Boulevard facility submitted evaluations to Lucas' employee file that were critical of his customer service skills.

An employment action is considered "adverse" only if it results in some tangible, negative effect on the plaintiff's employment. Here, the negative performance evaluations did not result in *any* effect on Lucas' employment with Grainger. Grainger did not rely on the evaluations to make any employment decisions regarding Lucas. Indeed, Lucas concedes in his brief to us that "Stewart did not use [the evaluations]; he merely placed them in [my] file." And Stewart testified in his deposition that he "simply wanted something in the file" to support his position that Lucas was not qualified to be a Customer Service Representative. Negative performance evaluations, standing alone, do not constitute adverse employment action sufficient to satisfy the second element of a prima facie case of retaliation under the ADA.[9] *See Silk v. City of Chicago,* 194 F.3d 788, 802-03 (7th Cir.1999) (concluding that the plaintiff's ADA retaliation claim fails because "he provided no evidence that any injury or adverse employment action resulted from the allegedly lower ratings [in his performance evaluations]."); *Cossette v. Minn. Power & Light.,* 188 F.3d 964, 972 (8th Cir.1999) ("[T]he negative evaluation does not by itself constitute an adverse employment action within the ADA's contemplation."); *see generally Davis v. Town of Lake Park,* 245 F.3d 1232, 1241 (11th Cir.2001) ("[C]ourts

---

[9]Lucas also contends that Stewart took an adverse employment action against him by harassing him and by threatening his job. However, he does not point to any evidence in support of that contention.

are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline.").

Lucas also contends that Grainger took adverse action against him by failing to reasonably accommodate him, by refusing to maintain him on light duty work, and by failing to engage him in an interactive process. But this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected, and it fares no better in this garb. *See Stewart,* 117 F.3d at 1288 ("[T]he acts Stewart describes relate directly to her 'reasonable accommodation' discrimination claim, not her retaliation claim, and accordingly provide no basis for denying summary judgment on this issue.").

AFFIRMED.