[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  11-13098
_____

D.C. Docket No. 5:09-cv-00395-MTT

ALONZO FREEMAN,

Plaintiff-Appellant,

versus

PERDUE FARMS INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(November 9, 2012)

Before JORDAN and FAY, Circuit Judges, and EDENFIELD,* District Judge.


PER CURIAM:

_____

 *  Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

Alonzo Freeman appeals from the district court's grant of summary judgment in favor of his former employer, Perdue Farms Incorporated. Following oral argument and review of the record, we reverse the grant of summary judgment on the Title VII wrongful termination and retaliation claims, affirm in all other respects, and remand for further proceedings.[1]

## I

The relevant facts, viewed in the light most favorable to Mr. Freeman, are as follows.

Mr. Freeman is an African-American male who was employed as a shipping and receiving supervisor at Perdue's plant in Perry, Georgia.  Mr. Freeman began his employment with Perdue in July of 2007.  In his first ten months on the job, Mr. Freeman was told he was doing a great job, had increased productivity, and saved Perdue considerable money.

In early 2008, a former employee at the plant, Cliff Danzy, told Mr. Freeman that there was a rope in the form of a hangman's noose in the office of Tom Lee, the director of operations at the plant.  On April 1, 2008, Mr. Freeman approached Human

---

[1] We affirm, for the reasons stated in the well-reasoned opinion of the district court, the entry of summary judgment in favor of Perdue on all but the wrongful-termination and retaliation claims under Title VII, and we discuss only those two claims.

2

Resources Manager Maria Rivera[2] and Mr. Lee, who is white, to inquire about the noose. Mr. Lee denied any knowledge of such a noose. Nonetheless, Ms. Rivera, Mr. Lee, and Mr. Freeman conducted a search of Mr. Lee's desk for the noose. After an initial search, the noose was not found. When Mr. Freeman stated that the noose could be found in the top right drawer underneath some papers, they looked again and found the noose, right where Mr. Freeman said it would be. The noose was approximately 3–4 inches long, and, when strung out, the rope was approximately 12 inches long. Mr. Lee removed the noose and handed it to Ms. Rivera, who put it around her waist and stated that the rope could also be used as a belt. Ms. Rivera and Mr. Lee both laughed at this statement. The noose was later thrown out.

Mr. Freeman complained to Mr. Lee that he did not appreciate what had been done about the noose, and particularly that Mr. Lee and Ms. Rivera had joked about it. He raised his concerns with Gary Miller, Perdue's human resources manager in the corporate headquarters, who was also African-American. Mr. Miller told Mr. Freeman that he would look into the matter. Mr. Freeman's complaints, however, were never investigated.

After the noose was discovered, Mr. Lee and Ms. Rivera investigated its origins. They discovered that the noose had been confiscated by Mr. Lee's predecessor, Richard

---

[2] Ms. Rivera's race is not apparent from the record.

3

Rateau, and placed in the desk drawer. According to Mr. Danzy, the noose had previously been on display in the office of a white maintenance supervisor. The noose could be seen from the hallway by anyone who passed the office. Mr. Danzy saw the noose, took it down, and brought it to Mr. Rateau. He told Mr. Rateau that the noose was going to cause problems at the plant if it remained on the wall where people could see it. After Mr. Rateau confiscated the noose he called a meeting with all the supervisors at the plant. Mr. Rateau said that he understood that some people were offended by the noose but that they should just get over it.

Mr. Danzy forgot about the noose until one day when he went to see Mr. Lee, who had taken over from Mr. Rateau. He entered Mr. Lee's office, where Ms. Rivera was also present, and saw the noose in the top right-hand drawer of Mr. Lee's desk. When Mr. Danzy asked Mr. Lee what the noose was for, Mr. Lee replied that "he would just keep it for he didn't know when he might need it." Mr. Lee and Ms. Rivera laughed at that comment.

According to Mr. Freeman, after he reported the noose and management's poor handling of the situation, he started to have trouble with the white managers at the plant. On April 14, 2008, Mr. Freeman complained to Ms. Rivera that one white supervisor, Joseph Ryan, had behaved inappropriately when he pointed his hands and fingers in Mr. Freeman's face and told Mr. Freeman to "calm down." According to other Perdue

4

employees, Mr. Freeman did nothing to warrant Mr. Ryan's admonitions. While Ms. Rivera investigated the incident, she received a complaint about Mr. Freeman from Larry Thompson, another white manager. Mr. Thompson said that he had been present when Mr. Ryan attempted to apologize to Mr. Freeman for the prior incident. Rather than accepting the apology, Mr. Freeman walked off, stating that he would not discuss anything other than chicken product. According to Ms. Rivera, Mr. Freeman told her that he did not want an apology; he wanted to break Mr. Ryan's face. A few days later, Mr. Thompson filed another complaint, alleging that Mr. Freeman stood up and raised his voice in a threatening and aggressive manner when Mr. Thompson asked him to take responsibility for the "offal area," the room where chicken product is discarded. According to Mr. Freeman, Mr. Thompson–like Mr. Ryan–pointed his fingers and hands toward Mr. Freeman's face.

Following these incidents, Mr. Freeman again contacted Mr. Miller in the regional office and relayed his concerns that Ms. Rivera, Mr. Ryan, and Mr. Thompson were "teaming up on" him in order to get him out of Perdue. After the incidents with Mr. Thompson and Mr. Ryan, Mr. Lee informed Mr. Freeman that he was being suspended for five days. Mr. Freeman appealed the suspension and on May 14, 2008, the suspension was rescinded. Mr. Freeman, Mr. Ryan, and Mr. Thompson all received memos indicating that the reported behavior would not be tolerated. The record of the

5

complaint and initial discipline remained in Mr. Freeman's file.

Mr. Miller investigated the incidents for which Mr. Freeman had been suspended. He determined that there was no harassment by any of the managers, including Mr. Freeman. It was simply a circumstance of heated conversations due to managers acting under pressure. He agreed that the five-day discipline was inappropriate.

From June 13 through June 26, 2008, Mr. Freeman made several visits and calls to Perdue's on-site wellness center in order to obtain refills of his prescriptions. Each time he visited or called, the staff explained that they could not assist him because only a doctor could provide him with a new prescription or refill. The wellness center staff who assisted Mr. Freeman reported that they felt threatened by Mr. Freeman and feared for their safety because he became agitated and raised his voice when they told him they could not help him. Mr. Freeman denied that he ever raised his voice to the wellness center staff. Nor did he recall any of the staff of the wellness center exhibiting any signs that they were afraid of him.

After one of Mr. Freeman's phone calls to the wellness center, Amanda Miller, who had spoken to Mr. Freeman, called Mr. Lee, Mr. Ryan, and Ms. Rivera to report Mr. Freeman's conduct and her concerns about Mr. Freeman's threatening behavior. But Dan Kiser, the Walmart pharmacist who was with Mr. Freeman during the phone call, said that Mr. Freeman never acted inappropriately during the call with Ms. Miller

6

or raised his voice. After this complaint, Darren Hoffman, Mr. Freeman's supervisor, counseled Mr. Freeman about his behavior. Mr. Freeman again brought these incidents to the attention of Mr. Miller.

On Monday, June 23, 2008, Mr. Hoffman requested that Mr. Freeman and his crew–who performed shipping and receiving functions– assist on the production lines. After some of his crew raised concerns, Mr. Freeman objected to Mr. Hoffman's request because he believed it would be unfair to ask the crew to do a job they were not trained for. Mr. Freeman also thought this could be used as a basis to fire members of the crew who might make a mistake. Mr. Hoffman then asked Mr. Freeman to leave the room so he could talk to the crew without Mr. Freeman. Mr. Freeman told Mr. Hoffman that he thought it was wrong that he should be dismissed from a meeting with his crew. Mr. Hoffman claimed that Mr. Freeman made several inappropriate and unprofessional comments in front of the crew. Mr. Freeman, for his part, denied making any inappropriate statements. Ronderious Armstrong, who was also present during the incident, testified that Mr. Freeman only presented the concerns of the crew to Mr. Hoffman but did not raise his voice or make any disrespectful or inappropriate remarks.

Shortly after this encounter, Mr. Lee, Ms. Rivera and Mr. Hoffman met to discuss what should be done about Mr. Freeman because of what they perceived as Mr. Freeman's increasingly frequent and escalating misconduct. They invited Mr. Miller,

7

who was in the area of the Perry plant for the week, to join them because of his extensive experience in human resources. The four agreed that Mr. Miller and Mr. Hoffman should meet with Mr. Freeman and give Mr. Freeman the option to resign or be terminated.

On June 26, 2008, Mr. Hoffman and Mr. Miller met with Mr. Freeman and informed him that he no longer had a future with the company. At the meeting, they pointed to Mr. Freeman's interactions with the nurses at the wellness center and the incident on June 23, 2008, where Mr. Freeman allegedly made inappropriate comments to Mr. Hoffman. Mr. Freeman was then given the option to resign. When he refused to resign, his employment with Perdue was terminated effective June 30, 2008.

After Mr. Freeman left Perdue, the company put his picture on display at the entrance to the facility. Although Perdue stated that this is the policy of the company whenever anyone is fired due to an incident related to violence, employees at the plant testified that they had never seen this done before.

Mr. Freeman filed a complaint against Perdue with the Equal Employment Opportunity Commission. In response to the EEOC's request for an explanation of the firing, Perdue cited Mr. Freeman's increasingly frequent incidents of misconduct beginning with Mr. Freeman's alleged altercations with Mr. Ryan and Mr. Thompson, even though these reasons were not cited to Mr. Freeman when he was terminated and

8

Mr. Miller had concluded that these incidents did not constitute harassment.

## II

We review *de novo* a district court's grant of summary judgment, applying the same legal standards as those governing the district court.  *See Sierra Club, Inc. v. Leavitt*, 488 F.3d. 904, 911 (11th Cir. 2007).  A court must grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views "all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and resolves "all reasonable doubts about the facts in favor of the nonmovant," *United of Omaha Life Ins. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

## III

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  To establish a *prima facie* case of discrimination based on race, Mr. Freeman must show that (1) he is a member of a

9

protected class; (2) he is qualified for his position; (3) he was terminated; and (4) he was replaced by a person outside of the protected class. *See Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995).

A Title VII plaintiff may prove his discrimination claim through direct evidence or through circumstantial evidence. If the plaintiff can show direct evidence of discrimination, the employer must proffer evidence showing that it "would have reached the same decision without" the discriminatory motive. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990). The plaintiff may also prove his claim through circumstantial evidence of discrimination by using the burden shifting analysis first established by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *See id.* at 802. Then the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the decision. *See id.* at 803. If it does so, the burden of production then shifts back to the employee to show that the articulated reason is a mere pretext for discrimination. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). A plaintiff may meet that burden and survive summary judgment by "presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons." *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997). Stated

10

differently, a "plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered reason is unworthy of credence.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (citation omitted).

Title VII also prohibits an employer from retaliating against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *See Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012).

## A

Addressing the retaliation claim first, we conclude that Mr. Freeman has established a *prima facie* case. As Perdue concedes, Mr. Freeman engaged in protected activity by complaining of potentially discriminatory or hostile conduct and suffered an adverse job action when he was terminated. Mr. Freeman has also presented sufficient evidence of a causal link between his protected activities and his termination. The causal link element is construed broadly so that "'a plaintiff merely has to prove

11

that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citation omitted). In general, a causal link can be established by showing that the decision maker knew of the protected conduct and there was a close temporal relationship between the protected conduct and the adverse employment action. *See Brungart v. Bellsouth Telecomm., Inc.*, 231 F.2d 791, 799 (11th Cir. 2000). When there is mere temporal proximity, without more, the link must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Conversely, the plaintiff need not show as close a temporal connection if he offers other evidence showing causation. *See, e.g.*, *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1461 (11th Cir. 1998).

Mr. Freeman has put forward sufficient evidence of a casual link between his complaint and the retaliation. Most of the managers involved in Mr. Freeman's termination–Mr. Lee, Ms. Rivera and Mr. Miller–were aware of Mr. Freeman's initial complaint.[3] In fact, the initial complaint involved both Mr. Lee and Ms. Rivera. The record before us also indicates that complaints against Mr. Freeman only began to emerge after his complaint about what he perceived as discriminatory conduct. And finally, Mr. Freeman was terminated a relatively short time after his initial complaint.

---

[3] There is nothing in the record to suggest that Mr. Hoffman knew of Mr. Freeman's complaint.

12

Taken together, these facts viewed in the light most favorable to Mr. Freeman are sufficient to establish a causal connection between his complaint and ultimate termination.

Given that Mr. Freeman has established a *prima facie* case, the burden shifts to Perdue to provide a legitimate non-discriminatory reason for the adverse job action. Perdue has carried this burden by asserting that it fired Mr. Freeman due to numerous incidents of misconduct. It points specifically to Mr. Freeman's verbal altercations with Mr. Ryan, Mr. Thompson, and Mr. Hoffman as well as Mr. Freeman's outbursts towards employees at the wellness center. The burden therefore shifts to Mr. Freeman to show that Perdue's proffered reason for his termination was pretext.

The district court determined that Mr. Freeman did not provide sufficient evidence of pretext to avoid summary judgment. We disagree.

We have held that when an employer offers multiple reasons for the termination of an employee, the employee must rebut each of the employer's proffered reasons for its actions. *See Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (*en banc*). To rebut Perdue's reasons for his termination, Mr. Freeman argues in essence that each of underlying incidents that formed the basis for his termination did not in fact occur as Perdue alleges. We believe that Mr. Freeman has presented sufficient evidence relating to each incident to create a genuine issue of material fact as to whether

13

there were increasingly frequent incidents of misconduct or whether each of these incidents simply served as pretext.

In addition to his own testimony contradicting Perdue's version of events, Mr. Freeman offered the testimony of three other witnesses. First, Mr. Kiser, the Walmart pharmacist that Mr. Freeman visited to fill his prescription, was present during one phone call from the Walmart pharmacy to Ms. Miller at the wellness center. He testified that he did not hear Mr. Freeman behave in a threatening manner or raise his voice. Mr. Freeman, for his part, also testified that he has never been disrespectful, on any occasion, to staff at the plant's wellness center. Second, Mr. Armstrong and Murriel Harris submitted affidavits stating that it was Mr. Ryan who behaved inappropriately towards Mr. Freeman when he approached Mr. Freeman's desk, raised his voice, and put his hands in Mr. Freeman's face. Mr. Armstrong and Ms. Harris did not observe or hear Mr. Freeman say anything disrespectful, raise his voice, or threaten Mr. Ryan. Third, Mr. Armstrong also says he observed the incidents involving both Mr. Thompson and Mr. Hoffman, and in neither incident did he see or hear Mr. Freeman raise his voice or behave in an inappropriate or disrespectful manner. Although Mr. Freeman admits that he once expressed disagreement with Mr. Hoffman over a task that his crew had been assigned, both Mr. Freeman and Mr. Armstrong testified that Mr. Freeman was simply relaying the concerns of his crew members and that his statements were neither

14

disrespectful nor a challenge to Mr. Hoffman's authority. The record also indicates that even though Perdue has offered the alleged confrontation between Mr. Freeman and Mr. Ryan and Mr. Thompson as a basis for the increasing misconduct, their own human resources manager, Mr. Miller, had investigated the incident and concluded that there was no harassment.

At the summary judgment stage we do not weigh testimony, and ask only whether the non-moving party, here Mr. Freeman, has created a genuine issue of material fact. We must consider all the evidence presented by Mr. Freeman, even as Perdue presents evidence to the contrary. The testimony of Mr. Freeman, the affidavits of third parties (Mr. Armstrong, Mr. Harris, and Mr. Kiser), the fact that Perdue initially concluded that the April incidents were not harassment but now cite them as such, the fact that Mr. Freeman's termination decision was jointly made by Ms. Rivera, Mr. Hoffman, and Mr. Lee, together with the relatively short period of time between Mr. Freeman's complaints and the termination, create a genuine issue of material fact as to whether there was in fact increasingly frequent misconduct by Mr. Freeman. As such, Mr. Freeman has provided sufficient evidence of pretext to allow his retaliation claim to survive summary judgment. *See*, *e.g.*, *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is wholly unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be

15

quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

## B

A similar analysis applies to Mr. Freeman's termination claim. As Perdue concedes, Mr. Freeman has met his *prima facie* burden. He is African-American and qualified for the position; he was terminated by Perdue; and he was replaced by a Hispanic man. Though Perdue carried its burden of demonstrating a legitimate non-discriminatory reason for terminating Mr. Freeman, namely the numerous incidents of alleged misconduct, Mr. Freeman–for the reasons set out with respect to the retaliation claim–has provided sufficient evidence of pretext to get to a jury.

## IV

Because Mr. Freeman produced sufficient evidence of pretext with respect to his claims for retaliation and termination based on race in violation of Title VII, the district court erred in granting Perdue summary judgment on those claims. The case is remanded to the district court for trial on these claims. In all other respects, the district court's grant of summary judgment in favor of Perdue is affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

16