[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11285

_____

CIERRA GETER,

Plaintiff-Appellant,

*versus*

SCHNEIDER NATIONAL CARRIERS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-01148-SCJ

_____

Before JORDAN, LAGOA, Circuit Judges, and CANNON,* District Judge.

LAGOA, Circuit Judge:

Cierra Geter worked for several years as a full-time, night-shift area planning manager ("APM") for Schneider National Carriers, Inc., a transportation and logistics company. After being diagnosed with post-traumatic stress disorder ("PTSD"), Geter took temporary leave from Schneider, as was her right under federal law. When her period of leave elapsed, Geter returned to work, but with an accommodation from Schneider: the company temporarily allowed her to work part-time, and partly from home, for several months, even though the company did not employ any other part-time APMs. Geter requested that Schneider continue to accommodate her several more times, and Schneider obliged. But after about three months, Geter requested another accommodation—a continuation of her part-time schedule and the ability to work remotely any time she was scheduled to work alone. Schneider denied this request and terminated her employment.

Geter sued Schneider under the Americans with Disabilities Act ("ADA"), asserting failure-to-accommodate, discrimination, and retaliation claims. Those claims hinged largely on whether Geter is a "qualified individual" within the meaning of the ADA. *See* 42 U.S.C. §§ 12112(a), 12111(8). A person is a qualified

---

* Honorable Aileen M. Cannon, United States District Judge for the Southern District of Florida, sitting by designation.

individual if she can "perform the essential functions of [her job] with or without reasonable accommodations." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *see also* § 12111(8). Schneider moved for summary judgment on the ground that Geter was not a qualified individual because full-time work and in-person work were essential functions of her job that she could not perform. The district court agreed with Schneider and granted the motion for summary judgment.

This appeal followed. After careful consideration, and with the benefit of oral argument, we hold that, on the record before us, there is no genuine dispute of material fact that full-time and in-person work were essential functions of Geter's role. We thus affirm.

## I.    BACKGROUND

### A. Geter Is Diagnosed with PTSD and Panic Disorder.

Schneider is a transportation and logistics company that operates twenty-four hours a day, seven days a week. In July 2014, Schneider hired Geter as a full-time dispatch analyst. That position was—and Geter knew it to be—a full-time role. Schneider soon changed the "dispatch analyst" job title to "area planning manager" ("APM").

Geter's responsibilities as an APM included coordinating dispatching drivers with customer loads, assisting drivers in gathering paperwork and load information, taking calls and messages from drivers, and resolving any driver issues. One of her primary responsibilities was supporting drivers. A job description for the role

noted that the APM position was an "Exempt (Salaried)" role and listed a variety of "[e]ssential [j]ob [d]uties and [r]esponsibilities," such as "[e]stablish[ing] [a] market plan," "[g]enerat[ing] actions to improve key factor results," and "regular and consistent attendance and timeliness." The description clarified that these responsibilities were "not an exhaustive or comprehensive list of all job responsibilities, tasks, and duties," as "[o]ther duties and responsibilities may be assigned and the scope of the job may change as necessitated by business demands." Under another heading titled, "Skills/Behaviors Necessary to Perform Job," the job description listed "[a]bility to develop relationships through interpersonal skills" and "[a]bility to work well in a fast paced, high pressure environment." This overall job description, according to Geter, "accurately reflected APM job duties." And Geter specifically conceded that Schneider considered the ability to develop relationships with drivers to be an important part of the APM job.

Geter worked at Schneider's site in Fairburn, Georgia. She worked on Wednesday, Thursday, Friday, and Sunday from 11:00 p.m. to 10:00 a.m.—a schedule Schneider called the "third shift." Geter reported to operations team lead Travis Torrence, who supervised second- and third-shift APMs as well as driver team leads. Torrence reported to operations manager Doug Horton, who, in turn, reported to operations director Marianne Biskey-Rose. Between 2018 and 2019, Audreianna Williams, Desmond Seymour, and Elaine Young also worked the third shift at the Fairburn location. Sometimes, Geter worked her shift alone, but there is a dispute in the record about how often she did. Geter insists she

typically worked alone only on Thursdays, while Torrence attests that she often worked alone, especially on Sundays. Geter testified that Schneider had lightly staffed her shift for "several years" and that she had often asked for additional support but received none.

The Fairburn location had a lounge for drivers to visit before or after their workday. Near the lounge was Schneider's operations office, where APMs worked. Drivers often visited the operations office to ask APMs for assistance with obtaining paperwork and load information. Between the office and the lounge, there was a printer located behind a locked door.

Geter maintains that her presence in the office was not necessary. She attests that she could access the printer remotely when she worked from home. Williams also attests—in general terms—that it was common for Fairburn APMs to work from home. But Geter acknowledges that Schneider's Atlanta-based drivers appreciated when APMs were in the office and that Schneider wanted its APMs in the office for that reason. She also concedes that being in the office was necessary when drivers asked for help finding trucks or retrieving keys from the office lockbox. At least sometimes, driver team leads and intermodal operating specialists also assisted drivers with finding keys. But these employees did not work the third shift.

Geter experienced significant mental health issues while employed with Schneider. Shortly before Geter began working at Schneider, she was the victim of attempted sexual assault at a truck stop. In 2015, a healthcare provider diagnosed her with major

depressive disorder. Later, in September 2018, Geter attempted suicide. Geter then sought and obtained a leave of absence from Schneider under the Family and Medical Leave Act ("FMLA"). Geter's psychiatrist, Dr. Cassandra Wanzo, subsequently diagnosed Geter with PTSD and panic disorder in October 2018. Geter testified that her suicide attempt sprang from a combination of her "personal demons" and an excessive workload that she had, unsuccessfully, asked Schneider to alleviate. The parties do not dispute that Geter had a disability within the meaning of the ADA.

### B. Schneider Accommodates Geter After Her FMLA Leave.

Schneider maintains a "Flexible Work Accommodation" ("FWA") policy for "work arrangement[s] other than full time onsite, that [have] been agreed to by the associate and leader, and continue[] to meet the business needs of the position." A description of the FWA policy states that "[f]lexible work arrangements are at the sole discretion of Schneider." Similarly, Schneider maintains a "Remote Work Policy" that allows employees to work remotely or "telework" if their supervisor approves the arrangement. The Remote Work Policy does not "apply to situations where associates work from home in remote locations on an occasional, inconsistent, or temporary basis." Schneider's director of operations, Biskey-Rose, and a human resources ("HR") employee for Schneider testified that supervisors had the discretion to allow employees to work from home because of emergencies or for specific personal reasons, but Schneider did not allow perpetual remote work.

Schneider at first approved Geter's FMLA leave from October 9, 2018, through December 31, 2018. During that time, Schneider relied on Torrence, Williams, and Seymour to cover Geter's shifts, with Torrence usually being the one to cover Geter's Sunday shifts.

Before Geter's approved leave period ended, Geter submitted a "Return-to-Work" form completed by Dr. Wanzo. Dr. Wanzo stated that Geter could return to work at the beginning of January 2019 with restrictions—specifically, a work schedule of three days per week, ten hours per day, until mid-February. Geter also requested that she not be scheduled to work her Sunday shift so that she could attend a weekly PTSD support group on Monday mornings. Schneider agreed to provide Geter with these accommodations.

Dr. Wanzo wrote another medical note that Geter submitted to Schneider on January 21, 2019. The note requested an extension of Geter's part-time work schedule to March 20, 2019. Schneider again agreed. Around February 2019, Geter worked from home on several days when she was scheduled to work alone with Torrence's permission.

Geter's reduced schedule burdened other Fairburn employees, but Geter disputes the extent of the burden. Torrence, for his part, insists that he worked Geter's Sunday night shift in addition to fulfilling his regular duties. Picking up the night shift meant that he would leave the office after an eight-hour shift at 7:00 a.m. and return to work at 1:00 p.m. to work another eight-hour shift. In all,

Torrence claimed that he worked between fifty-five and sixty hours per week while Geter worked part-time.

Geter disputes Torrence's account. She asserts that Torrence only "sporadically" covered her shifts and that other APMs who covered her shifts did not work overtime. But Geter does not dispute that because she, a night-shift APM, often worked alone, Schneider needed to staff other employees to cover any shifts that she missed or that those other employees had more work because of her absence. Indeed, Geter concedes that the Schneider employees who covered for her "had to work harder on their scheduled shifts if other employees were absent."

On March 9, 2019, Dr. Wanzo submitted medical documents and another request to keep Geter working part-time. But this time, Geter requested permission to work from home on Thursday, Friday, and any time she had to work alone. Dr. Wanzo's proposal would have kept this arrangement intact until the end of April 2019.

On March 18, 2019, a Schneider HR employee, Anissa Gauthier, emailed Dr. Wanzo to request more information about the new request. Dr. Wanzo responded with more medical documentation and a request that Schneider allow Geter to work three days a week, ten hours a day, and from home on two of those days (Thursday and Friday) until June 5, 2019. Gauthier emailed Dr. Wanzo and Geter a copy of a letter with questions that had to be answered for Schneider to determine whether to accommodate Geter's request. Gauthier observed that "[t]he end date of this

restriction has been extended 4 times and is appearing to be a permanent restriction." The email asked for a response "no later than" April 8, 2019. Geter provided the questions, which were contained in a letter attached to Gauthier's email, to Dr. Wanzo.

### C. Schneider Terminates Geter's Employment and Temporarily Alters Its Policies During the COVID-19 Pandemic.

#### 1. *Schneider Terminates Geter's Employment*

Biskey-Rose, Torrence, and Schneider HR employee Ashley Jansen considered Geter's accommodation request. Biskey-Rose asked Geter if she would switch her PTSD support group appointment so that she could work the Sunday overnight shift, but Geter rejected this option because the other available support group appointment conflicted with a doctor's appointment. Torrence attested that Schneider considered reassigning Geter to another position, but chose not to because Fairburn had only full-time positions. Jansen and Biskey-Rose discussed the alternative of hiring a temporary employee to fill in for Geter, but they decided that this option was not prudent because of the time it would take to hire and train the new employee, as well as the difficulty of assigning a new employee to work the third shift by herself.

These discussions were consistent with Torrence's sworn testimony. Torrence attested that full-time work was an essential function of the APM position because Schneider could ensure that it had the resources necessary to support drivers and dispatch loads at all hours of the day only by hiring full-time APMs. Torrence also

attested that while Geter worked for Schneider, in-person work was an essential function for second- and third-shift APMs because they needed to develop relationships with drivers, retrieve spare keys for drivers from the secure lock box, and print drivers' paperwork.

Thus, after consulting Jansen, Torrence and Biskey-Rose decided to terminate Geter's employment effective April 12, 2019. A couple of weeks later, Dr. Wanzo finally responded to Gauthier's letter, asserting that Geter could not work a Monday-through-Friday schedule and that Geter could not work in a fast-paced, high-pressure environment. In a declaration, Geter attests that other than her conversation with Biskey-Rose about switching her Monday group session so that Geter could work Sunday night, nobody from Schneider discussed a possible accommodation with her. Geter also insists that if Schneider had provided a short leave of absence through June 5, 2019, or offered to transfer her to the second shift, she would have accepted either accommodation. After Schneider fired Geter, it transferred Ryan Wheeler, another APM, from first shift to third shift when Williams resigned and hired two new people.

### 2. Schneider Accommodates Other Employees in Various Circumstances.

Geter contrasts her experience with that of several other Schneider employees. The first employee is Tiffany Kitchens, a first-shift APM. Kitchens always worked with other APMs on her shifts and never alone. Kitchens once requested and obtained three

weeks of FMLA leave.  The same year she took leave, her mother suffered a stroke, and Schneider approved her for additional intermittent FMLA leave.  But Kitchens testified that she did not use her approved leave and instead obtained permission from her supervisor to work remotely while her mother was in the hospital.  Kitchens used vacation time for days that she needed to take off, and she continued to work full-time.  Kitchens's mother left the hospital after four months, at which point Kitchens returned to full-time work from the office.

The record, however, is unclear regarding whether Kitchens worked remotely only as needed during those four months.  Geter cites her own deposition testimony as establishing that Kitchens "worked remotely for at least four months."  Geter testified that, during that period, she knew from conversations with the first-shift staff that Kitchens was sometimes not in the office and that Kitchens sometimes worked reduced hours, sometimes worked remotely, and sometimes was off.[1]  When pressed for specifics, Geter testified that she did not know exact days but that "[Torrence] would definitely know that, and [Kitchens's supervisor] would know that."  Geter also admitted that she was not in charge of

---

[1] "The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'"  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  We find that, on this point, Geter's testimony is inadmissible hearsay, as there is nothing in the record to indicate that her statement would lead to admissible evidence at trial.  Therefore, we do not consider this portion of Geter's testimony.

approving Kitchens's time off and had no access to her time records; as she stated, "[o]nly management and HR [have] those abilities." Biskey-Rose, however, testified that Kitchens worked remotely only as needed during that time.

Additionally, Sarah Kopf, a second-shift APM, testified that she knew "there were people that were able to have" reduced schedules, but that she did not "know specifics." Geter's lawyer asked Kopf at her deposition who worked reduced schedules "[b]ased on [Kopf's] personal knowledge." Kopf testified that Geter had a reduced schedule "when [she] came back" and that Kitchens "had a reduced schedule when she came back as well." But Kopf then qualified her testimony about Kitchens, saying, "I didn't know the details though because I didn't work with her on first shift." Despite Geter's and Kopf's testimonies regarding their understanding that Kitchens worked reduced hours, however, Kitchens testified that she worked full-time throughout the four-month period during which she sometimes worked remotely.

The second employee Geter points to is Kopf. Kopf was a second shift APM who reported to Torrence and sometimes worked alone. Kopf testified that Torrence permitted her to work from home a few times in the case of an emergency, but she never requested or was approved for sustained remote work. She also testified that she never worked a reduced schedule and did not ask to work from home when she was scheduled to work alone.

The third employee is Williams, who, as noted, was a third-shift APM whom Torrence allowed to work remotely throughout

the later stages of her pregnancy in late 2018 and early 2019. Beginning in February 2019, Williams took FMLA-covered maternity leave, and Schneider hired a temporary employee to replace her during that time.

Finally, Geter points to Torrence, who she asserts "took off" approximately eighty days in 2018 and supports her contention with an attestation that she drew this information from the Fairburn work calendar. But Geter did not append the calendar as an exhibit to any of her filings in the district court, and Schneider never produced it. The calendar is not part of the record on appeal.

3. *Schneider Reallocates Job Responsibilities After the Onset of the COVID-19 Pandemic.*

About a year after Geter's termination, the COVID-19 pandemic began. Schneider responded by making temporary adjustments to protect the safety of its employees. At first, Schneider transitioned APMs to full-time remote work, but it later adjusted the policy to two days a week of in-person work and three days a week of remote work. In March 2021, Schneider returned to a full-time, in-person schedule. Schneider also modified its protocol for printing in Fairburn during the pandemic. The company moved the printer to the drivers' lounge so that APMs could remotely print paperwork for drivers. Further, during the pandemic, Schneider left the office unlocked for drivers to retrieve their keys while Fairburn employees worked from home, but since returning to in-person work, the company has kept the office locked.

In April 2020, Schneider moved all of its APMs to Green Bay, Wisconsin, the site of its corporate office.  Schneider planned this change before the pandemic.  After the APMs moved to Green Bay, Schneider reassigned in-person driver-assistance responsibilities to the senior operating specialist ("SOS") position.  SOSs remained in Fairburn to retrieve keys from the lockbox as needed.  Schneider also reassigned other in-person responsibilities that previously belonged to APMs to other employees.

## D. Geter Sues Schneider and the District Court Enters Summary Judgment in Schneider's Favor.

Geter filed suit against Schneider on March 12, 2020, asserting claims under the ADA for failure to accommodate, disability discrimination, and retaliation, and claims for race discrimination under Title VII of the Civil Rights Act and 42 U.S.C. § 1981.[2]  Eventually, Schneider moved for summary judgment on all claims.  Schneider argued that Geter's failure-to-accommodate claim failed because she was not a qualified individual, she was not discriminated against when her unreasonable request was denied, and she herself caused a breakdown in the interactive, accommodation process.  Schneider similarly contended that Geter's ADA discrimination claim lacked merit because she was not a qualified individual and Schneider did not treat any similarly situated employee more

---

[2] The magistrate judge recommended that the district court deny Geter's race discrimination claims.  Because Geter neither objected to the magistrate's recommendation, nor raised the issue on appeal, we consider these claims abandoned.

favorably.  And Schneider argued that it should be granted summary judgment on the ADA retaliation claim because Geter had not shown a causal relationship between her request for an accommodation and her termination.  Geter urged the district court to reject each of these arguments.

A magistrate judge issued a report and recommendation on Schneider's motion and recommended that the motion be granted. The magistrate judge first addressed Geter's failure-to-accommodate claim.  Outlining the evidence, the magistrate judge observed that Schneider considered full-time, and in-person work essential for the APM position and concluded that under the governing law, Schneider's determination was due substantial weight.  The magistrate judge next considered Schneider's FWA and remote-work policies.  He concluded that the policies did "little to support [Geter's] argument that working full-time or from the office are not essential functions" because the policies expressly depend on supervisors' judgment and circumstance-dependent needs of each position.  The magistrate judge also noted Geter's own testimony that certain parts of her job could not be performed from home, as well as Kopf's and Torrence's testimonies to the same effect.

The magistrate judge rejected Geter's arguments that events postdating her termination supported her failure-to-accommodate claim.  In particular, the magistrate judge deemed it insignificant that Geter could have accessed the Fairburn printer remotely because while she was employed, the printer was in a locked office that drivers could not access without an APM.  The magistrate

judge then explained that the relocation of APMs to Green Bay did not help Geter because at that time, Schneider reassigned the in-person aspects of APMs' jobs to other positions, thus changing the nature of the APM role after Geter had left. The magistrate judge similarly reasoned that Schneider's temporary transition to remote work during the pandemic showed that temporary remote work "may have been feasible with . . . extra measures in place," but ultimately conflicted with APMs' essential functions and Schneider's preferences.

Ultimately, the magistrate judge concluded that full-time work, in-person work "when only one APM was scheduled," and working in a fast-paced, high-pressure environment were all essential functions of APMs at the time Geter was terminated. Whether Geter was a qualified individual for ADA purposes turned on whether she could perform those essential functions with or without a reasonable accommodation. The magistrate judge concluded that Geter could not do so and that she had not argued that she could.

Next, the magistrate judge considered Geter's discrimination and retaliation claims. The magistrate judge found that Geter's ADA discrimination claim failed because she had not shown that she was a qualified individual—the same showing she failed to make in support of her failure-to-accommodate claim. Additionally, the magistrate judge concluded that the ADA discrimination claim failed because Geter did not show that Schneider treated a similarly situated comparator more favorably than her

nor produce other compelling circumstantial evidence in support of her claim.

The magistrate judge then turned to the ADA retaliation claim. He concluded that the close temporal proximity of Geter's termination to her request for an accommodation amounted to a prima facie showing of causation. He considered whether Schneider had articulated a legitimate, non-retaliatory reason for Geter's firing. Here again Schneider argued that it had a legitimate reason for terminating Geter's employment: she could not perform the essential functions of the APM position. The magistrate judge agreed that Schneider had carried its burden of showing a legitimate, non-retaliatory reason for Geter's termination because Biskey-Rose, Torrence, and Jansen arrived at the decision to terminate Geter after considering alternatives and determining that she could not perform the essential functions of her job. And the magistrate judge found that Geter had not pointed to any probative evidence suggesting that their explanation for her termination was pretextual. Thus, the magistrate judge recommended granting summary judgment in favor of Schneider on the retaliation claim. Geter then filed objections to the report and recommendation.

Over Geter's objections, the district court affirmed the report and recommendation and dismissed Geter's case. Tackling the failure-to-accommodate claim first, the district court found that the APM job description weighed more in Geter's favor than Schneider's. But the district court held that other factors, including the experiences of other APMs, Schneider's judgment, and the

increased workload on other APMs resulting from Geter's reduced schedule—including the undisputed absence of any part-time employees in Geter's APM position—favored Schneider. The district court also agreed that Geter's testimony about Torrence's taking around eighty days off in 2018 was inadmissible hearsay and, in any event, did not move the needle on Geter's claim because Torrence had a different job. Based on these conclusions, the district court found that there was no genuine dispute of material fact that full-time work was an essential function of Geter's job. It therefore did not consider whether in-person work or working in a fast-paced, high-pressure environment were essential.

Accordingly, the district court adopted the report and recommendation's finding that Geter was not a qualified individual under the ADA. And, like the magistrate judge, the district court determined that Geter's ADA discrimination and ADA retaliation claims failed for the same reason. Thus, the district court adopted and affirmed the report and recommendation's finding that the claims failed.

The district court entered judgment in favor of Schneider, and Geter timely appealed.

## II.    STANDARDS OF REVIEW

We review *de novo* a district court's order granting summary judgment. *Mech v. Sch. Bd.*, 806 F.3d 1070, 1074 (11th Cir. 2015). "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). When considering a motion for summary judgment, a court must "construe the facts and draw all inferences in the light most favorable to the nonmoving party" and, if a conflict arises between the facts evidenced by the parties, "credit the nonmoving party's version." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). "On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005); *see also* Fed. R. Civ. P. 56(c)(2).

We review a district court's evidentiary rulings for abuse of discretion, even when those rulings come at the summary-judgment stage. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018). And we may affirm a grant of summary judgment on any ground that finds support in the record. *Roy v. Ivy*, 53 F.4th 1338, 1346 (11th Cir. 2022); *Lucas*, 257 F.3d at 1256.

### III.    ANALYSIS

Geter argues on appeal that the district court erred in granting summary judgment to Schneider on her failure-to-accommodate, discrimination, and retaliation claims. She maintains that a reasonable factfinder could have concluded that she is a "qualified individual" under the ADA. Construing the undisputed facts in the light most favorable to Geter, we disagree and address each claim in turn.

### A.  Failure-to-Accommodate Claim

Geter first challenges the entry of judgment against her on her failure-to-accommodate claim.

The ADA provides as follows: "No covered entity shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added).  The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).  And it defines the phrase "discriminate against a qualified individual on the basis of disability" as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).  That definition forms the basis of failure-to-accommodate claims.

A plaintiff can establish a prima facie failure-to-accommodate claim under the ADA by showing that: "(1) he is disabled; (2) he was a 'qualified individual' at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability," i.e., his employer failed to

22-11285              Opinion of the Court              21

reasonably accommodate him.  *Lucas*, 257 F.3d at 1255.  An accommodation is reasonable "only if it enables the employee to perform the essential functions of the job."[3]  *Id.*

The parties do not dispute that Geter is disabled within the meaning of the ADA, so only the second and third failure-to-accommodate elements are at issue.  Additionally, Geter does not contest that, at the time of her termination, she could not work full-time or in-person whenever she was scheduled to work alone.  Nor does Geter dispute that Schneider had no designated part-time employees in the APM position at the time she sought the accommodations, or that Schneider had to have another employee cover Geter's in-office duties when she worked reduced hours or worked remotely.  Instead, she argues that neither full-time work nor in-person work was an essential function of her job.  The district court concluded that Geter was not a qualified individual because full-time work was an essential function of Geter's job that she could

---

[3] We have held that the *McDonnell Douglas* burden-shifting framework applies to ADA discrimination claims, and we have passingly suggested that it governs failure-to-accommodate claims.  *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (suggesting that the framework applies at least to discrimination claims); *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (suggesting in passing that the framework applies in considering a failure-to-accommodate claim).  But in an unpublished case, we held that the *McDonnell Douglas* framework does not apply to failure-to-accommodate claims. *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007) ("[W]e join [our sister circuits] today and hold that *McDonnell Douglas* burden-shifting is not applicable to reasonable accommodation cases.").  We need not resolve this matter because Geter has not shown that she is a qualified individual, which is her initial burden under either approach.

not perform.  The magistrate judge, however, determined that both full-time work and in-person work when only one APM was scheduled to work were essential functions of Geter's position. Although the district court did not reach the magistrate judge's recommendation that in-person work when only one APM was scheduled to work was also an essential function of Geter's position, the parties fully briefed this issue to the Court and, as noted above, we can consider and affirm the judgment on any ground that finds support in the record.  *See Lucas*, 257 F.3d at 1256.  On appeal, Geter raises both issues.  We thus address both whether full-time or in-person work were essential functions of Geter's job.[4]

"'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform."  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors."  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).  An important factor is the employer's judgment as to whether a function is essential.

---

[4] Geter concedes in her initial brief that "[s]he had trouble working in a fast-paced, high-pressure environment throughout her employment with Schneider, not beginning with her need for accommodations in 2018 and 2019."  Additionally, Geter did not dispute that working in a fast-paced, high-pressure environment was an essential function of her position, instead challenging Schneider's position that she could not perform this function.  The magistrate judge thus concluded that working in a fast-paced, high-pressure environment was an essential function of Geter's position.  The district court, however, did not address whether working in such an environment was an essential function, and we likewise do not address the issue here.

Congress provided in the ADA that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). We have said that the employer's assessment deserves substantial, but not conclusive, weight. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007).

Federal regulations identify several other relevant factors, including "(1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting *Davis*, 205 F.3d at 1305); *see also* 29 C.F.R. § 1630.2(n)(3). These regulations also enumerate several bases for concluding that a job function is essential, e.g., if the position exists to perform the function, if there are a limited number of employees available among whom the performance of the job function can be distributed, or if the function is highly specialized and the incumbent in the position was hired for his or her ability to perform the particular function. *See* 29 C.F.R. § 1630.2(n)(2).

### 1. *Full-Time Work*

We begin with the district court's conclusion that working full-time was essential for third-shift APMs.

First, we must consider Schneider's judgment as to what functions are essential. *See Holly*, 492 F.3d at 1258. Geter acknowledges that we must consider Schneider's assessment that full-time work was essential for Geter's position, but argues that Schneider's APM job description "is substantial evidence that in Schneider's judgment full-time work is not essential" and weighs in her favor. Geter overstates her case. It is true that the description did not explicitly state that the APM role was full-time. But it did identify the APM position as "Exempt (Salaried)" and noted that it was not "an exhaustive or comprehensive list" of all essential duties. This is further supported by the offer letter submitted to Geter in July 2014, which explicitly characterized the position as "[f]ull time; 40 hours per week." The APM job description thus does not reveal a genuine dispute of material fact as to whether full-time work was an essential part of the job.

But other available evidence supports the conclusion that Schneider deemed a full-time schedule essential to the third-shift APM role. Despite the job description, Geter testified that she knew she was assuming a full-time position when she was hired. Schneider did not hire any part-time APMs at Fairburn. Torrence, Geter's supervisor, attested that full-time work was essential to supporting drivers, considering that drivers were on the road and could encounter problems twenty-four hours a day, seven days a week. Further, because the third shift was lightly staffed such that third shift APMs often worked alone, it was particularly critical for third shift APMs to work each of their scheduled shifts.

To counter this evidence, Geter argues that Schneider's FWA policy shows that APMs could be accommodated with part-time arrangements because the policy itself "contains no carve-out for APMs." But Geter's logic is flawed. The FWA policy was, on its face, not generally applicable to all Schneider employees; the policy permits flexible work arrangements only on a case-specific basis, upon approval by the employee's supervisors, and when the arrangement mutually benefits both Schneider and the employee. Thus, because the FWA policy does not apply to employees except in very specific circumstances, there was no need for the policy to carve out the APM position. And again, other record evidence indicates that the third-shift APM position was not well-suited for part-time work because third-shift APMs were often assigned to work alone. That is one reason why Geter's reduced schedule caused others, including Torrence, to be reassigned to her shifts.

Thus, for these reasons, the FWA policy does not cast doubt on Schneider's judgment that full-time work was essential. And that judgment is due substantial weight. *See Holly*, 492 F.3d at 1258.

We next consider "the consequences of not requiring the incumbent to perform the function"—i.e., of not requiring Geter to work full-time. *D'Angelo*, 422 F.3d at 1230 (quoting *Davis*, 205 F.3d at 1305). The record speaks directly to this factor because Schneider allowed Geter to work part-time for several months. According to Geter, Torrence covered for her only "sporadically" and

other employees who covered for her did not work overtime.[5] But these assertions are largely beside the point. Geter does not dispute that because she often was assigned to work alone—as were other third-shift APMs—Schneider needed to staff other employees to cover for any shifts that she missed, or that other employees had more work as a result of her absence. Indeed, she acknowledges in her brief that other employees "had to work harder"—and had to work the night shift—in her absence. The burdens that Geter's part-time schedule caused other Schneider employees to bear weigh in Schneider's favor. *See* 29 C.F.R. § 1630.2(n)(2)(ii) (stating that a "function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed"); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) (affirming grant of summary judgment and explaining that a "minor 'reshuffling' of . . . assignments proposed by [the plaintiff] necessarily would require the reallocation of an essential part of his job").

And the mere fact that Schneider managed to get by for three months while Geter worked part-time does not create a genuine dispute of material fact. In *Holbrook*, for example, we affirmed the grant of summary judgment to an employer despite evidence that the employer temporarily "was able to accommodate [the plaintiff]" because the previous accommodation "may have exceeded that which the law requires" and the "decision to cease

---

[5] Because the parties dispute the extent to which Torrence covered Geter's shifts, we must credit the nonmoving party's account at summary judgment.

making those accommodations" does not violate the ADA. 112 F.3d at 1528. We follow the same course here.

Next, we turn to "the current work experience of incumbents in similar jobs." *D'Angelo*, 422 F.3d at 1230 (quoting *Davis*, 205 F.3d at 1305). Geter argues that the experiences of other APMs show that full-time work was not essential. In particular, Geter emphasizes Kopf's testimony that some people worked reduced hours and Geter's own testimony that Torrence took off around eighty days throughout 2018.

A review of the record shows that Kopf's testimony does not create a genuine dispute of material fact. Kopf testified that she knew of only two other APMs who worked reduced hours—Geter and Kitchens. But Kopf also made clear that she knew no "specifics" or "details" about Kitchens's arrangement because she did not work the same shift. Kitchens, by contrast, testified that although she worked remotely during the period she was approved for FMLA leave, she did not work a reduced schedule. Given Kitchens's testimony about her own schedule, Kopf's vague and equivocal testimony that Kitchens worked part-time is not enough to create a *genuine* dispute of material fact about whether Kitchens worked full-time. *See, e.g.*, *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000) (finding that the testimony supporting the non-moving party at summary judgment "simply [was] too indefinite to meet" that party's burden and that other testimony was "too ambiguous to create a genuine dispute of material fact"); *Jefferson*, 891 F.3d at 924–25 (affirming district court's exclusion of

conclusory testimony because the affiant did not provide sufficient facts to conclude that the witness had personal knowledge of the issue, and observing that we have "consistently held that conclusory allegations without specific supporting facts have no probative value" (quoting *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2020))); *see also Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1308 (11th Cir. 2012) (discounting "general and ambiguous deposition testimony, without the inclusion of specific facts," at summary judgment as "insufficiently probative").

Moreover, even if Kopf were right that Kitchens temporarily worked a reduced schedule, that would not be material to Geter's claim. Kitchens worked a different, more heavily staffed shift that could be more easily covered by others, reported to a different supervisor, and she was approved for FMLA leave—i.e., was entitled not to work *at all*—for at least much of the time that she worked from outside the office.[6] Kitchens's situation is thus a poor comparison to Geter's request for further accommodation. And the experiences of Schneider employees in similar positions reinforces Schneider's view that full-time work was essential for APMs, and particularly for third-shift APMs like Geter.

---

[6] An employee who is eligible for FMLA leave is entitled to take leave, but, in contrast, a qualified individual with a disability is entitled only to a *reasonable* accommodation under the ADA. *See* 29 C.F.R. § 825.702(a) (explaining that "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA]" (alterations in original)).

Relatedly, Geter argues that the district court abused its discretion in excluding her testimony that Torrence took time off in 2018. *See Jefferson*, 891 F.3d at 924 (reviewing evidentiary ruling at summary judgment for abuse of discretion). We disagree. First, Geter fails to persuade us that Torrence's alleged time off even matters. Torrence was an operations team lead and Geter's supervisor; he was not an APM. So, his alleged absences imply nothing about the essential duties of APMs.

Second, even if Torrence's absences were relevant, the district court also did not abuse its considerable discretion in excluding Geter's hearsay testimony based on the unproduced calendar. Geter argues that the calendar would be admissible as a business record at trial. *See* Fed. R. Evid. 803(6). We are not persuaded. Because the calendar is not in the record, we cannot speculate that the calendar will turn up before trial. Further, we cannot speculate that the unproduced calendar will fall within the business records exception. *Cf. Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial."). Indeed, "admissibility under the business records exception boils down to reliability, 'and a trial judge has broad discretion to determine the admissibility of such evidence.'" *United States v. Ahmed*, 73 F.4th 1363, 1382–83 (11th Cir. 2023) (quoting *United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020)). Thus, based on the record before us, we conclude that the district court did not abuse

its discretion in determining that Geter's testimony about the calendar was inadmissible hearsay.

Therefore, viewed as a whole, the record establishes that full-time work was an essential function of Geter's job.  Schneider determined that a full-time schedule was an essential aspect of the third-shift APM position.  Schneider's judgment is entitled to substantial weight regardless of other evidence.  But on the record before us, the other relevant factors—the consequences of Geter's part-time schedule, the experiences of other Schneider employees in similar positions, and the limited number of employees available to cover Geter's missed shifts—also uniformly weigh in Schneider's favor.[7]  Geter, by contrast, has not pointed to record evidence sufficient to create a genuine dispute of material fact.  We thus hold that, based on the record evidence, the district court did not err in concluding that full-time work was an essential function of Geter's job.  *See Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) (finding unreasonable a requested part-time accommodation, where the employer had no part-time jobs at the time the employee requested

---

[7] We do not consider several of the factors mentioned by our precedents because they are unhelpful in the context of this record.  For example, we have no need to analyze "the amount of time spent on the job performing the function" because doing so would be circular: the function we are considering is how much time Geter needed to be working.  *See D'Angelo*, 422 F.3d at 1230 (quoting *Davis*, 205 F.3d at 1305).  We also need not consider the terms of any collective bargaining agreements and the work experience of past incumbents in Geter's job because the record contains no evidence of either.  *See id.*

the position, and where the employer would have had to create a part-time position to provide the requested accommodation).

To be clear, our holding should not be read to lessen the need for or the possibility of allowing part-time work arrangements as a reasonable accommodation under the ADA. Indeed, part-time work could well be a reasonable accommodation in some circumstances, particularly where the employer has part-time jobs readily available. *Id.* Congress specifically provided that "'reasonable accommodation[s]' may include . . . part-time or modified work schedules." 42 U.S.C. § 12111(9)(B); *see also* 38 C.F.R. § 18.412(b)(2). But whether an accommodation is reasonable is analytically separate from the threshold question of whether an employee is a qualified individual. An employee is "qualified" under the ADA only if she "could perform the essential functions of the job in question with *or without reasonable accommodations*." *Lucas*, 257 F.3d at 1255 (emphasis added); *see also* 42 U.S.C. § 12111(8). "In other words, the ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." *D'Angelo*, 422 F.3d at 1229 (alterations in original) (quoting *Davis*, 205 F.3d at 1305). And under our precedents, whether a function such as full-time work is essential is a fact-intensive inquiry that depends on the circumstances of the case. *See, e.g.*, *Davis*, 205 F.3d at 1305.

Other courts have adopted this approach. For instance, in *Hostettler v. College of Wooster*, 895 F.3d 844 (6th Cir. 2018), the Sixth Circuit considered whether full-time work was an essential function of an employee's job. *See id.* at 855–56. Although the court,

viewing the specific record before it, concluded that full-time work was not essential and reversed the district court's grant of summary judgment, it recognized that the essential-function "analysis does not lend itself to categorical rules—'it is highly fact specific.'" *Id.* at 854 (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 605 (6th Cir. 2018));  The court also explained that "'[r]egular, in-person attendance is an essential function' of most," but not all, jobs, and "courts must perform a fact-intensive analysis" in determining if it is.  *Id.* (alteration in original) (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015) (en banc)); *see also Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048–49 (8th Cir. 1999) (explaining that an employee was not a qualified individual because she could not work her full-time job at the time of his termination).

We agree that determining what job functions are essential is a fact-specific endeavor.  *Terrell*, 132 F.3d at 626 ("Whether an accommodation is reasonable depends on specific circumstances.").  So while we reach a different result than the Sixth Circuit in *Hostettler* in assessing the distinct record before us, we also recognize that, in other contexts, there will be cases in which an employee points to evidence that would permit a reasonable factfinder to determine that full-time work is not an essential function of the particular job at issue.

### 2.  In-Person Work

Geter also contends that in-person work was not an essential function of her job.  We turn first to Schneider's judgment

regarding the APM job.  Although Geter argues that Schneider did not consider in-person work essential, the record shows otherwise. The APM job description listed "regular and consistent attendance and timeliness" as essential.  Torrence attested that in-person work was essential to Geter's job.  And Geter herself testified that Schneider's wanted its APMs in the office because Atlanta-based drivers appreciated when APMs were physically present.  In short, there is no real dispute that Schneider considered in-person work essential to Geter's job.  And again, Schneider's judgment is entitled to substantial weight.  *See Holly*. 492 F.3d at 1247.

Next, we address "the current work experience of incumbents in similar jobs."  *D'Angelo*, 422 F.3d at 1230 (quoting *Davis*, 205 F.3d at 1305).  Geter argues that the work experiences of other APMs support her position that in-person work was not essential. The best comparator for Geter is Williams, another third-shift APM who Torrence sometimes permitted to work remotely during the later stage of her pregnancy in early 2019.[8]  Williams's vague testimony about this temporary arrangement lends minimal support to Geter's argument, but ultimately, it does not move the needle.  The record contains no details about how often Schneider permitted Williams to work remotely or how the company managed when Williams was scheduled to work alone.  Schneider also knew that Williams would soon take FMLA-covered maternity leave and, as a result, was hiring a temporary employee to cover

---

[8] Although Kitchens also worked remotely at times while her mother was sick, Kitchens was a first shift APM who, unlike Geter, never had to work alone.

for Williams.  Geter, by contrast, continually requested accommodations with no definite end dates and specifically requested that she be allowed to work both remotely and alone.

The next factor is "the consequences of not requiring" Geter to work at the office.  *D'Angelo*, 422 F.3d at 1230 (quoting *Davis*, 205 F.3d at 1305).  Geter's own deposition testimony shows why this factor weighs heavily in Schneider's favor.  Geter testified that if Schneider approved her to work from home every time she was scheduled to work alone—as she requested in April 2019—she would have still needed someone in the Fairburn office to assist with unanticipated driver issues, retrieving keys, and finding trucks.  Geter's admission that *someone* needed to be in the office when she was scheduled to work alone hurts her argument that in-person work was not essential.  Schneider was "not required by the ADA to reallocate job duties in order to change the essential functions of [Geter's] job."  *Holbrook*, 112 F.3d at 1528 (quoting *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995)).

Geter resists this conclusion by arguing that the Fairburn office's operations after the onset of the COVID-19 pandemic prove that being in the office to retrieve keys for drivers and help them find trucks was not necessary.  This argument lacks merit.  The bare feasibility of temporarily suspending a function in response to the COVID-19 pandemic does not demonstrate that the function was not essential.  The only way Schneider could allow Geter to work remotely when she was scheduled to work alone was to keep the office unlocked during her shift to allow drivers to obtain keys.

22-11285               Opinion of the Court                    35

And although the company left the office unlocked for a short time at the beginning of the pandemic, it has required locking the office ever since its return to in-person work. Accepting Geter's argument that Schneider should have permitted her to work remotely and alone would require Schneider to (1) jeopardize company property by leaving its office unlocked and unattended all night or (2) assign someone to be physically present in the office, thus demonstrating the necessity of physical presence. Because Geter's argument that Schneider should return to its pandemic-era policies collapses into an argument that Schneider should effectively excuse Geter from performing a fundamental function of her job, we reject it.

Geter again stresses Schneider's FWA and remote-work policies. But those policies neither create a genuine dispute or material fact nor contravene the more specific evidence that APMs did not work remotely under them for any sustained period. Kitchens, to be sure, might have worked remotely some days during the four-month period that her mother was in the hospital, but Kitchens was approved for FMLA leave and the arrangement was temporary. Kitchens also worked a different, more heavily staffed shift and, unlike Geter, never worked alone. Kitchens's temporary arrangement thus indicates little about the essential functions of Geter's role.

Last, Geter points to Schneider's 2020 relocation of APMs to Green Bay and reallocation of responsibilities among its positions after it terminated her employment. But Schneider's pandemic-era

changes only confirm that in-person work was essential for APMs like Geter *when she worked there*. *See, e.g.*, *Browning*, 178 F.3d at 1048–49 (framing the relevant question as whether the employee "was . . . a qualified individual at the time of her termination"); *Terrell*, 132 F.3d at 626 (focusing on "when Plaintiff demanded such a position"). When Schneider relocated APMs, it had to reassign the essential, in-person aspects of the APM job to SOSs in Fairburn. Geter cannot rebut evidence that in-person work was an essential function of her job by arguing that Schneider should have simply eliminated the function. *See Holbrook*, 112 F.3d at 1528.

For these reasons, in-person work was essential to Geter's job. The experiences of other APMs, like Williams, provide at best only minimal support for Geter's argument. But every other pertinent factor—Schneider's judgment and the consequences of permitting Geter to work remotely any time she worked alone—strongly supports Schneider's view that in-person work was essential to Geter's job. After all, Geter, at her deposition, admitted that key aspects of her job required her physical presence in the office.

Accordingly, there is no genuine dispute of material fact that full-time and in-person work were essential functions of Geter's job. The district court properly granted summary judgment to Schneider on Geter's failure-to-accommodate claim.

## B. Discrimination Claim

Geter also maintains that the district court improperly granted summary judgment to Schneider on her ADA discrimination claim. We apply the *McDonnell Douglas* burden-shifting

framework when evaluating ADA discrimination claims. *See Holly*, 492 F.3d at 1255. "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Id.* at 1255–56. For the reasons discussed in Geter's failure-to-accommodate claim, we conclude that Geter's ADA discrimination claim fails because she is not a qualified individual. We thus conclude that the district court properly granted summary judgment to Schneider on Geter's ADA discrimination claim.

### C. Retaliation Claim

The ADA also provides that "[n]o person shall discriminate against any individual because such individual . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). We assess ADA retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). "To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Id.* Once that initial showing is made, the burden shifts to the employer to "come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Id.* If the employer does so, the plaintiff "must then demonstrate that [she] will be able to establish at trial that the employer's

proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Id.*

The district court determined that Geter made a prima facie case of retaliation, and that Schneider articulated a legitimate, non-discriminatory reason for terminating Geter—that Geter could not perform her job's essential functions. Neither party challenges these conclusions. So we will assume without deciding that the district court was correct to proceed to the third question posed by the *McDonnell Douglas* framework: whether Geter can establish that Schneider's proffered reasons for her termination were pretextual.

She cannot. Geter's only argument for pretext is that she was "capable of performing the essential functions of her job with her requested reasonable accommodations," and thus "any reason for terminating her employment rather than allowing her the benefit of reasonable accommodations is pretext for discrimination and retaliation." So again, Geter links her retaliation claim to her failure-to-accommodate claim: she can succeed only by establishing that full-time work and in-person work were not essential functions and that Schneider failed to reasonably accommodate her. But for the reasons we have discussed, there are no genuine disputes of material fact that Geter could not perform the essential functions of her job. Accordingly, we conclude that the district court correctly entered judgment against her on her retaliation claim.

## IV.    CONCLUSION

22-11285              Opinion of the Court              39

For the reasons discussed, we affirm the district court's grant of summary judgment in favor of Schneider.

**AFFIRMED.**